928 P.2d 610

**STATE of Arizona, Appellee,**

v.

**Martin Raul SOTO–FONG, Appellant.**

**No. CR–94–0046–AP.**

Supreme Court of Arizona,
En Banc.

Nov. 19, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Division, Susanna C. Pineda, Assistant Attorney General, Phoenix, for Appellee.

Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. by James W. Stuehringer, Tucson, for Appellant.

## OPINION

MOELLER, Justice.

### FACTS AND PROCEDURAL HISTORY

At 10:15 p.m. on June 24, 1992, police were called to the El Grande Market in Tucson, where they found the bodies of Fred Gee (the manager of the market), Ray Arriola (an employee of the market), and Zewan Huang (Gee's elderly uncle). Each had been shot with .38 and .25 caliber handguns.

Shortly thereafter, police found an abandoned car three blocks from the market. Christopher McCrimmon's fingerprint was found on the driver's side window.[1] Earlier that night, Queen E. Ray had loaned McCrimmon the car in return for money. Her testimony established that McCrimmon, Andre Minnitt, and a third person, whom she knew as Martinez, left McCrimmon's apartment with the car around 10:00 p.m. Ray

---

1. McCrimmon and a co-defendant, Andre Minnitt, were tried and convicted together, but sepa- rately from Fong.

testified that Martinez was the defendant, Martin Raul Soto–Fong. Ray also testified that about an hour after she loaned them the car, the three returned to McCrimmon's apartment without the car, and McCrimmon gave Ray $30 and the car keys.

The market was in the process of closing at the time of the murders. *See infra* note 8. Two registers had been cleared, leaving only one open. The body of the manager, Fred Gee, was found at the open register at the liquor counter. The register had a sale rung up on it, and nearby on the counter were bags containing a cucumber and three lemons. Defendant's fingerprints were found on the bags. On the floor near Gee's body were two $1 food stamps, not yet stamped with the market's name. Defendant's fingerprint was found on one of these food stamps. At least $175.52 was missing from the store.

Soon after his release from prison in late August, some two months after the murders, Tucson police arrested Keith Woods on a drug charge. In exchange for his release and the dismissal of that charge, Woods agreed to act as an informant. On September 8, Woods told Detective Joe Godoy that McCrimmon and Minnitt had told him they committed the murders with a third person, Cha–Chi, who had worked at the market. Woods later identified Cha–Chi as Fong.

Fong, age seventeen at the time of the crimes, was charged in juvenile court with three counts of first degree murder, one count of armed robbery, two counts of attempted armed robbery, one count of aggravated robbery, two counts of attempted aggravated robbery, and one count of burglary. The juvenile court transferred Fong to adult court. His trial took place before the trial of McCrimmon and Minnitt. Defendant's theory at trial was one of mistaken identity; he claimed Cha–Chi was not Fong, but Martin Garza, another acquaintance of McCrimmon's. Defendant also maintained that detectives improperly handled fingerprint evidence, making the evidence inherently unreliable.

Fong was convicted on all counts except the burglary count. He was sentenced to death on each of the three murder counts and to terms of years on all the other counts.

We have jurisdiction over this direct, automatic appeal pursuant to Ariz. Const. art. VI, § 5(3), Ariz. R.Crim. P. 31.2 and A.R.S. § 13–4031.

## ISSUES

**Trial Issues**

I. Whether the trial court erred in refusing to exclude portions of the testimony of defendant's witness Woods.

II. Whether the trial court abused its discretion by denying defendant a new trial based on newly discovered evidence (McCrimmon's testimony at his subsequent trial).

III. Whether the trial court erred in precluding impeachment of latent print expert O'Sullivan.

IV. Whether the trial court erred in refusing defendant's *Hash v. State* jury instruction.

V. Whether the trial court erred in precluding Tolander's testimony of an earlier threat against one of the victims.

VI. Whether the trial court erred in denying defendant's Rule 20 motion for acquittal.

**Death Penalty Eligibility Issues**

I. Whether the evidence supports the findings that the murders were committed in an especially heinous, cruel or depraved manner under A.R.S. § 13–703(F)(6).

II. Whether receipt of testimony concerning Minnitt's and McCrimmon's statements precludes the death penalty.

III. Whether defendant's death sentence can withstand review of the credibility of defense witness Woods and the veracity of McCrimmon and Minnitt.

IV. Whether the evidence supports the finding of pecuniary motive under A.R.S. § 13–703(F)(5).

V. Whether the aggravating factor A.R.S. § 13–703(F)(8) (multiple homicides) is unconstitutional on double jeopardy grounds.

VI. Whether defendant's age at the time of the murders (seventeen) is a constitutional bar to a death sentence.

VII. Whether the death penalty must be set aside because of victim impact evidence.

### Independent Review of Statutory and Non–Statutory Mitigation

I. Age

II. Residual Doubt

III. Family Ties

IV. Felony Murder Instruction

V. Lack of Criminal Record

VI. Employment History

VII. Behavior at Trial

VIII. Availability of "True Life" Sentence

### DISCUSSION

**Trial Issues**

**I. Did the trial court err in refusing to exclude portions of the testimony of defendant's witness Keith Woods?**

Defendant makes two separate contentions concerning Woods' testimony. An understanding of the events leading to the testimony is essential to the resolution of each contention.

**A. Background**

Keith Woods, called as a witness by the defendant, testified that during August 1992, on the day he was released from prison, McCrimmon and Minnitt discussed the El Grande Market homicides with him. About one week after this discussion, Woods was arrested for possession of cocaine. The police offered to drop the charges against him (which carried a potential sentence of twenty-five years) if Woods would provide information about other cases. When Woods failed to provide additional information, police again arrested him. On September 8, Woods told Detective Godoy that McCrim-

mon and Minnitt had said they robbed the market with a third person named Cha–Chi. In the September 8 taped interview, Woods referred to Cha–Chi as "the Mexican dude" who "set it up" and who had worked at the El Grande Market.

Following the September 8 interview, Woods attempted to hide from the police to avoid testifying against his friends McCrimmon and Minnitt. He was apprehended by police and gave another taped statement to Detective Godoy on November 20. In his second statement (November 20), which also concerned his August conversation with McCrimmon and Minnitt, Woods said that McCrimmon and Minnitt had used the name Martin to refer to Cha–Chi and that Cha–Chi was "Betty Christopher's boyfriend." [2]

Prior to trial, defendant filed a motion in limine arguing that he should be allowed to introduce Woods' September 8 statement that McCrimmon and Minnitt said the third murderer was Cha–Chi, the "Mexican dude" who was a former employee of the market. Defendant claimed "Woods' September 8 statement to detectives [was] admissible as it represent[ed] the declarations against interest of McCrimmon and Minnitt and exculpate[d] defendant by its reference to Cha–Chi." However, in the same motion in limine, defendant claimed that Woods' later November 20 statement regarding the August conversation with McCrimmon and Minnitt should be excluded. Defendant contended Woods' November 20 statement that McCrimmon and Minnitt had also told him, *during the same conversation in August,* that Cha–Chi was "Martin, Betty Christopher's boyfriend," was inadmissible because it was inculpatory as to defendant and its admission would violate defendant's "rights of confrontation under the Sixth and Fourteenth Amendments."

■ The trial court delayed ruling on the pretrial motion in limine. At trial, after hearing additional argument on the motion, the judge denied it. The trial court ruled

---

**2.** At trial, defendant acknowledged that his name is Martin and that he was Betty Christopher's boyfriend, but introduced evidence that he has never been called Cha–Chi and that Cha–Chi is

another individual named Martin Garza, who testified to his own innocence at defendant's trial.

that if defendant elected to elicit testimony from Woods regarding his conversation with McCrimmon and Minnitt, the state would not be precluded from bringing out Woods' other statements regarding that same conversation. Following this ruling, defendant elected to introduce Woods' testimony regarding all of the statements, including the statements defendant had attempted to exclude by way of his motion in limine.[3] Defendant now claims that the trial court erred by not excluding those portions of McCrimmon's and Minnitt's statements sought to be suppressed in his motion in limine.

## B. Defendant's *Williamson* Argument

 Because the evidence demonstrated that Fong was not known as Cha–Chi, *see supra* note 2, defendant has consistently argued that Woods' September 8 statement to Godoy (that Cha–Chi was the third murderer) is admissible hearsay because it exculpates defendant. Defendant maintains that Woods' later statements to Godoy that clarified Cha–Chi and Fong were the same person were not exculpatory as to Fong, were not self-inculpatory as to McCrimmon and Minnitt, and were thus inadmissible under *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Defendant's argument misinterprets *Williamson.*

In *Williamson,* the Supreme Court held that "[t]he question under Rule 804(b)(3) is **always** whether the statement was sufficiently against the **declarant's** penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true'...." 512 U.S. at 606, 114 S.Ct. at 2438 (footnote omitted) (emphasis added). Thus, according to *Williamson,* the 804(b)(3) issue is whether the statements we're inculpatory as to McCrimmon or Minnitt, not as to Fong. *See State v. Nieto,* 186 Ariz. 449, 924 P.2d 453 (App.1996) ("To

determine if a statement is truly against interest requires a fact-intensive inquiry of the surrounding circumstances and each declaration must be scrutinized to determine if it is self-inculpatory in light of the totality of circumstances."). Woods' September 8 version of the statements (that the third murderer was Cha–Chi who "used to work there"), which defendant claimed was admissible, and Woods' later version that Cha–Chi was "Martin, Betty Christopher's boyfriend" were equally non-self-inculpatory with regard to McCrimmon and Minnitt, the hearsay declarants.

Woods' testimony as to the identity of the third murderer was based solely on a conversation Woods had with McCrimmon and Minnitt on the day Woods was released from jail. Defendant maintains that he should have been permitted to introduce some of Woods' descriptions of this conversation but to exclude other descriptions of the same conversation from the same witness. The trial court simply ruled that if defendant introduced some of what McCrimmon and Minnitt told Woods about the third murderer, the state would be permitted to introduce Woods' other statements about what McCrimmon and Minnitt told him in the same conversation. The trial court's decision is the correct approach. *See State v. Woratzeck,* 134 Ariz. 452, 454, 657 P.2d 865, 867 (1982) (holding defendant opens the door to further inquiry on a topic by introducing that topic in its examination of a witness); *State v. Mincey,* 130 Ariz. 389, 405, 636 P.2d 637, 653 (1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982) (noting "Arizona follows the English or 'wide open' rule, wherein cross-examination may extend to all matters covered by direct examination ..." and holding defendant opened the door to evidence relating to his selling heroin by mentioning in opening that he was a heroin addict).

Defendant attempts to question the credibility of McCrimmon and Minnitt. The rea-

---

**3.** There is a suggestion in the state's brief that, by choosing to "draw the sting," the defendant has waived this entire issue. We reject this suggestion and deal with the merits of the trial court's ruling. *See Davis v. Cessna Aircraft Corp.,* 182 Ariz. 26, 36, 893 P.2d 26, 36 (1994) (holding that plaintiffs did not waive their objection to the admission of a report because, "[a]lthough plain-

tiffs were the first to refer to [the report] after it was admitted, the reference was an effort by plaintiffs to draw the sting...."); *State v. Ellerson,* 125 Ariz. 249, 251, 609 P.2d 64, 66 (1980) ("[A] party should not necessarily lose his right to appeal a ruling because he alters his strategy in response to a trial court's finding against him.").

sons for doubting the veracity of McCrimmon and Minnitt arguably support excluding their statements entirely but do not justify admitting only those portions that benefit defendant. For example, defendant contends McCrimmon and Minnitt were friends with Woods, they were blame-shifting, and the statements in question were non-self-inculpatory. However, these same factors apply to Woods' September 8 version of his conversation with McCrimmon and Minnitt, which defendant has consistently maintained is admissible and which defendant himself introduced.

Defendant also claims the statement by McCrimmon and Minnitt is internally inconsistent. He points out that they told Woods Cha–Chi was used to gain entrance to the store, which was in the process of closing. Cha–Chi was able to convince the victims to let him in the store because he had worked there and was known to the victims. Defendant claims this statement contradicts other statements *by Woods* indicating Cha–Chi wore a mask when he entered the store. Defendant ignores the fact that Woods testified that he said Cha–Chi went in "masked down **or whatever**" because he, Woods, had simply assumed, without knowing, that Cha–Chi had worn a mask. Testimony does not demonstrate, as defendant contends, that McCrimmon and Minnitt told Woods that Cha–Chi wore a mask. The testimony simply demonstrates that Woods assumed a mask was worn.

Had the issue been raised, it may very well be that all of McCrimmon's and Minnitt's statements concerning Cha–Chi would have been held inadmissible. *Williamson* indicates that only those statements within a confession "that are individually self-inculpatory" are admissible under Rule 804(b)(3). 512 U.S. at 599, 114 S.Ct. at 2435 ("We see no reason why collateral statements, ... even ones that are neutral as to interest, ... should be treated any differently from other hearsay statements that are generally excluded."). *Cf. State v. Daniel,* 169 Ariz. 73, 74, 817 P.2d 18, 19 (App.1991), *cert. denied,* 502 U.S. 1121, 112 S.Ct. 1243, 117 L.Ed.2d 475 (1992) ("In short it was not necessarily against [declarant's] penal interest to inculpate appellant, and he may have believed it would further his own interest by creating

the possibility of a 'deal' with police."). However, once defendant made the tactical decision to introduce some of Woods' testimony about the August conversation, he could not simultaneously preclude the state from introducing other evidence of that same conversation. Rather than have the state bring out the challenged portion, defendant sought to "draw the sting" by bringing it in himself.

Nor will we second-guess trial counsel's tactical decision to introduce evidence that the murderer was Cha–Chi, even at the expense of opening the door to Woods' later statements. Fingerprint evidence and other testimony connected defendant to the crime. It is understandable that defense counsel would want to raise the issue of whether Cha–Chi, a person other than Fong, committed the murders, even at the expense of other evidence indicating that "Cha–Chi" was Fong. Having chosen a strategy which brought into issue portions of McCrimmon's and Minnitt's statements to Woods, defendant cannot complain that the court should have precluded the state from introducing additional portions of those same statements.

## C. Defendant's Confrontation Clause Argument

■ Defendant makes a secondary argument concerning the Woods testimony. He argues that *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), constitutionally entitled him to introduce the September 8 statements (presumably without the risk of the state introducing the November 20 statements) because those statements were exculpatory as to Fong. This argument misses the mark for several reasons. First, defendant continues to ignore the fact that the September 8 statement was at least partially inculpatory as to Fong. As noted above, Woods told police on September 8 that McCrimmon and Minnitt said Cha–Chi was a former employee of the El Grande Market. *See supra* Trial Issue I.A. This, in effect, excluded Martin Garza, who, the defense claimed, was the "real" Cha–Chi, but included Fong.

Second, this case does not raise a *Chambers* problem because defendant was not prevented from introducing exculpatory evidence. No one sought to prevent defendant from using the September 8 statement. The

trial judge simply ruled that if portions of the August conversation were introduced, the state would not be precluded from introducing other explanatory portions.

Finally, we believe defendant reads *Chambers* too broadly. *Chambers* did not hold that trial judges must always admit exculpatory hearsay. Instead, in *Chambers,* the Court was careful to point out that the hearsay statements which should have been admitted by the trial court in that case were "offered at trial under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. at 1048. What defendant ignores is that in *Chambers,* as in *Williamson,* the reliability inquiry is focused on the hearsay declarants. *Id.* Defendant's position, that McCrimmon and Minnitt were reliable in only those statements that assist defendant's case, has no factual or legal basis.

Defendant proceeds to attack Woods' credibility, but this inquiry misses the mark as well. Even if Woods were the hearsay declarant, what defendant would need to demonstrate (and what he attempted to show in his brief and at argument) is that Woods was unreliable in his later statements but reliable on September 8. Defendant fails in this regard because the factors to which defendant points as demonstrating Woods' unreliability apply to all of Woods' statements; not simply those defendant seeks to exclude.[4]

## II. Did the trial court abuse its discretion by denying defendant a new trial based on newly discovered evidence, the newly discovered evidence being McCrimmon's testimony at his own, later trial?

■ Defendant claims Christopher McCrimmon's testimony at his trial one

month after Fong's trial constituted "newly discovered evidence" and the trial court erred in denying his motion to vacate judgment based on this evidence. Defendant argues that the following areas of McCrimmon's testimony constitute newly discovered evidence:

McCrimmon denied involvement in the El Grande shootings .... acknowledged borrowing Queen E.'s car earlier that evening [to purchase drugs], abandoning it at a location a few blocks from the El Grande.... McCrimmon testified that he was by himself at the time Queen E. loaned him the car ... that he knew [Fong] as simply an acquaintance ... [and] denied that [Fong] was known as Cha–Chi.... McCrimmon did admit knowing a person named Cha–Chi ... [and] stated that he had taken Woods ... to Cha–Chi's house [for drugs] and that Cha–Chi lived close by.

Defendant points out that, although McCrimmon was convicted at his own trial, defendant's "jury need not be convinced of McCrimmon's innocence in order to consider his testimony to acquit [Fong]." Both parties acknowledge that McCrimmon would still be able to claim a valid Fifth Amendment privilege at any retrial in this case and that McCrimmon intends to exercise the privilege, if necessary. However, defendant contends he would still be able to introduce McCrimmon's prior recorded testimony under Rule 804(b)(1). We do not reach the merits of that contention.

■ "Motions for new trials based on newly discovered evidence are disfavored,

4. Defendant has consistently argued that Woods' September 8 statement was reliable because it was given "when Woods was facing a 25–year sentence on his own charges and was highly motivated to cooperate with the detectives." Defendant argues that courts should view with some skepticism "statements made with an eye to obtaining a 'deal with the government,' " citing *United States v. Magana–Olvera,* 917 F.2d 401, 408 (9th Cir.1990). Defendant ignores the fact that all of Woods' statements were "made with an eye to obtaining a deal with the government." To the extent that Woods was unreliable because he made a deal to avoid prison, he was

just as unreliable on September 8 as on November 20. His motivation was constant once he made his bargain with the police. Defendant also argues that declarations implicating someone other than the speaker are less reliable, that McCrimmon and Minnitt were speaking to a friend who they did not expect to use the statements against them, that the three had known each other for years, and that McCrimmon and Minnitt made Cha–Chi out to be the ringleader. None of these factors address the issue of whether the post September 8 statements are unreliable.

and we grant them cautiously. Absent an abuse of discretion, we will not disturb a trial judge's determination that a new trial for newly discovered evidence is not necessary." *State v. Serna,* 167 Ariz. 373, 374, 807 P.2d 1109, 1110, *cert. denied,* 502 U.S. 875, 112 S.Ct. 214, 116 L.Ed.2d 172 (1991) (citation omitted). The requirements for granting a new trial based on newly discovered evidence are:

> (1) the motion must show that the evidence relied on is, in fact, newly discovered; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) the evidence must be material to the issue involved; and (5) it must be evidence which, if introduced, would probably change the verdict if a new trial were ordered.

*Serna,* 167 Ariz. at 374, 807 P.2d at 1110.

The trial court is in the best position to evaluate the potential effect upon the jurors of newly discovered evidence. *State v. Medrano,* 173 Ariz. 393, 399, 844 P.2d 560, 566 (1992). It was well within the trial court's discretion to have determined that McCrimmon's testimony would probably not have changed the verdict. *See State v. Fisher,* 141 Ariz. 227, 251, 686 P.2d 750, 774, *cert. denied,* 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984) ("[I]f the motion [for new trial] relies on the existence of a witness willing to testify and present the new evidence at a new trial, such witness must appear to be credible to the trial judge hearing the motion."). Defendant's strategy at trial was to show that he was not involved in the murders or the robbery of the market. McCrimmon's testimony (apart from that which is cumulative, discussed *infra*) was that he was by himself when Ray loaned him the car, he was not involved in the shootings, he was in the area to purchase drugs, and he knew Fong only as an acquaintance.

McCrimmon's denials amounted to nothing more than a repetition of defendant's own position that he was not involved in the crime in any way. McCrimmon's jury rejected his testimony and found him guilty of murder and robbery. More importantly, McCrim-

mon's testimony did not offer anything new in the way of support as to why defendant's theory of the case was the one the jury should accept. At least a portion of McCrimmon's "new" testimony was cumulative. Testimony that Fong was not known as Cha–Chi and that Cha–Chi was Martin Garza was introduced at Fong's trial. Fong's family and friends testified that he was not known as Cha–Chi, and Garza himself testified that he was known as Cha–Chi and that he sold drugs.

Fong's jury was presented with substantial evidence of Fong's guilt. This evidence included: (1) Fong's fingerprints on items found on the counter and floor where the murders took place; (2) Ray's testimony that Fong was with McCrimmon and Minnitt when she loaned them the car found near the scene of the murder and was with them when they returned shortly after the murder; (3) Woods' testimony that the third murderer was "Martin," "the Mexican dude," who "used to work there;" (4) the uncontested fact that Fong was a former employee of the market; and (5) the testimony that the store was closing at the time of the crime and only a person recognized by the victims could have gained admission.[5] McCrimmon's complete denial of involvement, essentially nothing more than a repetition of Fong's unsuccessful trial strategy, would probably not have swayed the jury. We certainly cannot say that the trial judge abused his discretion in denying the motion for new trial based on newly discovered evidence.

### III. Did the trial judge err in precluding impeachment of latent print expert Timothy O'Sullivan?

Defendant claims that the trial judge improperly prevented him from introducing evidence impeaching latent print examiner Timothy O'Sullivan. Prior to · trial, defendant filed a memorandum in which he expressed his desire to impeach O'Sullivan regarding his medical condition and his performance in a previous case. Defendant raised this issue as part of his attempt to show that, although fingerprints found in the store were his own,

---

**5.** For a more complete recitation of the evidence against Fong, *see infra* Trial Issues III–V.

the prints were not lifted from the food stamps lying next to Gee's body or the plastic bags found on the counter where Gee had been working. The trial court held that defendant could not impeach O'Sullivan based on his medical condition or his prior mistake in another case. Defendant made an offer of proof and introduced several exhibits to provide the court with the impeachment evidence.

### A. Medical Condition

■ Defendant contends that he should have been allowed to introduce evidence that "in the relevant time frame O'Sullivan suffered from terminal cancer, was in significant pain, and was taking narcotic medications including Decadron." Defendant claims that this evidence "was relevant to the issue of O'Sullivan's work at the crime scene and, more importantly, his processing of fingerprints from physical evidence at the station house...."

At the crime scene, Detective Godoy and Detective Wright shared the responsibility of collecting the evidence after it was photographed (which included the bags of lemons and the cucumber and the food stamps). O'Sullivan's function at the crime scene was to give suggestions concerning the photographing and packaging of evidence and to advise the detectives on what items needed to be processed. Detective Godoy and O'Sullivan put the bags with the lemons and the cucumber into evidence envelopes. Specifically, Godoy put the bag from which the lemons were taken in an envelope marked "From lemons" and the bag from which the cucumber was taken in an envelope marked "From cucumber." Detective Miller then sealed the envelopes.

Although O'Sullivan removed the cucumber from its bag and dusted it for fingerprints at the crime scene, Godoy subsequently placed the cucumber in an envelope. Detective Godoy put the food stamps into an evidence envelope.[6] Detective Karen Wright prepared a map and log of the evidence taken from the scene and the locations of those items, and the log indicated that the "cucumber/lemons in baggie" were taken from the counter at the register in the liquor department.

Defendant, as justification for his proffered impeachment of O'Sullivan, points to deviations from standard police procedure at the crime scene. One deviation was that several items, including those found on the counter near Fred Gee's body, were individually bagged in envelopes, then placed in a larger bag and may have been transported by O'Sullivan to the police station. This was a deviation insofar as the envelopes should have been transferred in the van driven by the I.D. technician and should not have been segregated from other items. Another alleged deviation was that the items taken from the murder scene were placed in a "drying room" at the police station which the detectives had "hijacked" to store bloody items. Defendant does not explain how these deviations tainted the evidence.

Nor did defendant, in his offer of proof, adequately show how O'Sullivan's terminal illness, his prescription medicine, or his mood in any way related to whether the bags and food stamps were adequately sealed, transported, and tested or whether Detective Wright properly noted the location of the items on her map and log.[7] Defendant does not present a chain of custody issue.

The authority defendant cites does not support admission of his proffered impeachment evidence. In *State v. Hallman*, 137 Ariz. 31, 668 P.2d 874 (1983), this court held that the trial court did not abuse its discretion by allowing the state to bring out on cross-examination that defendant's brother, who testified on defendant's behalf at trial, had refused to honor a state subpoena. *Id.*

---

6. Defendant contends in his reply that the credible testimony indicates the food stamp with Fong's print was taken from the cash register. Although Godoy did admit that he mistakenly told Judge Meehan that the food stamp came from the register, other testimony indicates that the only food stamps taken from the store were those found next to Gee's body.

7. Dr. Rosenberg, O'Sullivan's oncologist, noted no behavioral effects of Decadron on O'Sullivan. Also, although the magnitude of O'Sullivan's grief upon learning of his terminal disease was "greater than average," Dr. Rosenberg testified that O'Sullivan's anxiety was typical of those suffering terminal illnesses.

at 35–36, 668 P.2d at 878–79. The court held that this evidence was relevant to show bias and that the scope of the impeachment was properly limited because the trial court only allowed the state to inquire with regard to the time period after the witness had been released from jail. *Id.*

In *Hallman,* the court held that a defendant has the right to introduce "evidence that may in the slightest degree affect the witness' credibility." 137 Ariz. at 36, 668 P.2d at 879. However, the court did so in the context of evidence concerning the bias of a witness. It is hardly analogous to argue that a defendant must be allowed to probe all areas relating to the mood or health of a witness, even though the defendant fails to show that the witness' mood or health related to the events in question.

### B. Prior Misidentification

■ Fong also claims he should have been allowed to impeach O'Sullivan by introducing evidence showing O'Sullivan had misidentified a fingerprint in the "Prime Time Rapist" case in Tucson in 1986. Fong claims that as a result of that case O'Sullivan himself admitted his credibility "was shot" and he was "fined $32,000." However, O'Sullivan did not admit that at the time in question his credibility was "shot." Instead, as defendant's offer of proof makes clear, O'Sullivan said his credibility after the "Prime Time Rapist" case had been "shot," but he proceeded to study, attend courses and seminars, give lectures, and re-establish himself in the field, and he was once again respected by his peers well before the murders in this case occurred. Additionally, O'Sullivan was not "fined" $32,000. He was demoted, which caused him to lose a certain amount of compensation and to be promoted at a lower pay scale. He calculated that over the course of his career, the demotion might cost him $32,-000.

However, even assuming that misidentification in another case might, under some circumstances, be admissible on credibility, there was no error in excluding such evidence here because defendant does not even dispute that in this case O'Sullivan properly identified the prints in question as belonging to defendant.

### IV. Did the trial judge err in refusing defendant's *Hash v. State* jury instruction?

■ The trial court instructed the jurors that:

> The State must prove the defendant guilty beyond a reasonable doubt. This means that the State must prove each element of the charge beyond a reasonable doubt. If you conclude that the State has not met its burden of proof beyond a reasonable doubt, then reasonable doubt exists, and the defendant must be acquitted of that charge.

Defendant argues that the trial court erred by refusing to also give a requested jury instruction based on *Hash v. State,* 48 Ariz. 43, 59 P.2d 305 (1936), which expands on the reasonable doubt concept. We have held that trial courts must, in trials beginning after January 1, 1996, provide a standard instruction explaining the concept of reasonable doubt. *See State v. Portillo,* 182 Ariz. 592, 596–97, 898 P.2d 970, 974–75 (1995). However, we have also previously held that "though the trial court must always instruct the jury that the prosecution must prove its case beyond a reasonable doubt, there is no requirement that a trial court define reasonable doubt for the jury." *State v. Bracy,* 145 Ariz. 520, 535, 703 P.2d 464, 479 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). Because the trial in this case occurred before the date specified in *Portillo,* defendant's contention is without merit.

### V. Did the trial court err in precluding the testimony of Dennis Tolander concerning an earlier threat to one of the victims?

■ Defendant claims he should have been allowed to introduce the testimony of Dennis Tolander, who had been in the El Grande Market in early June 1992 (the month of the murders) and had overheard an Hispanic male threaten Fred Gee during a dispute "about money." Defendant points out that there were two black males in anoth-

er part of the store when the threat was made (McCrimmon and Minnitt are both black). Tolander, when shown a photograph of Martin Garza (Cha–Chi), could not be certain, but said the photo resembled the person making the threats. Defendant contends that this testimony would have corroborated the September 8 testimony of Keith Woods (that Cha–Chi was the third murderer) and Martin Garza's testimony that he was friends with McCrimmon and that he moved shortly after the shootings.

The trial judge is afforded discretion to determine whether the probative value of relevant evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Williams*, 133 Ariz. 220, 230, 650 P.2d 1202, 1212 (1982) (quoting Ariz. R. Evid. 403). "The rule is that threats by a third person against a victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." *Id.* (quoting *State v. Schmid*, 109 Ariz. 349, 356, 509 P.2d 619, 626 (1973)). Tolander's offered testimony indicates that he saw someone who resembled Garza threaten Gee, not that he saw Garza himself threaten Gee.

Even assuming Tolander's testimony established that Garza threatened Gee, the trial court did not abuse its discretion in deciding there was no other evidence connecting Garza to the commission of the crime. Woods' September 8 statement, which defendant relies upon heavily, indicated that the third murderer was the "dude . . . [who] worked there." It is undisputed that Garza

did not work at the El Grande. Also, the El Grande was in the process of closing at the time of the murders.[8] While the market was closing, customers could present themselves at the gate and, if they were recognized, they would be allowed in the store. Thus, as Woods' September 8 statement indicates, McCrimmon and Minnitt would most likely have been in the company of a third individual who was known to Fred Gee. It was not an abuse of discretion to conclude that Woods' statement did not have an inherent tendency to connect Garza to the murders.

Additionally, Garza's fingerprints were not found in the store, while Fong's were. Although defendant claims his prints could have been left in the store when he worked there several months before, this does not explain the presence of his prints on unstamped food stamps found on the floor next to the body of Fred Gee. Testimony indicated that the food stamps would have been marked by the store on the day they were received. Also, the fingerprints found on the lemon and cucumber bags on the counter near Gee's body belonged to Fong, not Garza.

Although Fong may have touched baggies while working in the store months prior to the murders, or even while shopping in the store prior to the murders,[9] it is highly unlikely that Fong unrolled a spool of plastic bags, placed his prints on a baggie, and then rolled it back up on the spool. Likewise, assuming Fong touched bags that were lying around the store, it is unlikely that days, weeks, or even months after Fong touched those two particular bags, the killer entered the store, found those same bags, and used them to carry lemons and a cucumber to the liquor counter where Gee was shot.

8. Richard Gee, Fred Gee's brother, testified that Fred Gee would either lock the gate with the sliding bolt, lock it with a key, or do both during closing procedures. Kathy Lopez, who worked for Central Alarm, testified that Gee was scheduled to close at 9:00 p.m. on June 24, that she called Gee at about 9:40 p.m. to get an update, and Gee "said the usual thing, that he was going to be ten minutes late." Cynthia Sayre testified that it was Gee's practice, while closing the store, to stand at the liquor counter, count the money from the registers, and only admit customers who were recognized. At this time the gate would be closed, but the door of the store would remain open. After Gee counted the money, he would put it in cigarette cartons.

9. Fong's co-worker, Cynthia Sayre, testified that Fong quit working at the El Grande around September of 1991, about ten months before the murders. Sayre worked from 3:00 to 10:00 p.m. She saw Fong in the store shopping about four or five times after he quit working at the market, the last being around April of 1992, some two months before the murders.

Finally, Queen E. Ray identified "Martinez Fong," not Garza, as the Hispanic male who left with McCrimmon and Minnitt in her car shortly before the time of the murders, and returned without her car shortly thereafter. Although she referred to Fong as Martinez, not Martin, she identified Fong at trial. Apart from defendant's offer of proof regarding Tolander's vague recollection, the only evidence which connects Garza to the crime is his nickname: Cha–Chi. Because all of Woods' descriptions of Cha–Chi (including those in his September 8 statement) indicate that the Cha–Chi to whom Woods referred could not have been Garza, there was no evidence, apart from Tolander's offered testimony, with the inherent tendency to connect Garza to the crime. It was not an abuse of discretion for the trial court to exclude evidence of the threat.

## VI. Did the trial court err in denying defendant's Rule 20 motion for acquittal?

Defendant claims that he is unable, due to space limitations, "to fully set forth the basis for his Rule 20 motion for acquittal which was denied by the court below." We decline to guess as to what defendant considers to be the basis for his motion. This opinion addresses only those issues properly argued in the brief. *See State v. Bolton*, 182 Ariz. 290, 298, 896 P.2d 830, 838 (1995) (holding that "[a]rgument must be in the body of the brief" and that defendant may not invoke page limits as an excuse for insufficient argument on appellate review).

### A. Robbery–Related Counts

Defendant argues that "any and all robbery-related counts pertaining to Huang and Arriola were not supported by sufficient evidence in light of the fact that there was no evidence showing a taking or an attempt to take property 'from [their] person or immediate presence.' A.R.S. § 13–1902(A)."

"A.R.S. § 13–1902 requires only that force be used 'against any person,' not necessarily only against the person dispossessed of the property." *State v. McGuire*, 131 Ariz. 93, 96, 638 P.2d 1339, 1342 (1982). Force was used to prevent all three of the victims

in this case from resisting the taking of property from the El Grande Market. This action falls within the purview of A.R.S. § 13–1902(A).

### B. Murders—Sufficiency of Evidence

Defendant also argues that "the State produced no **credible** evidence of guilt through witnesses Woods or Queen E. Ray, thereby leaving only the fingerprint evidence. As to the fingerprint evidence, it was legally insufficient to convict [Fong] on the homicides." (Emphasis in original.) Defendant's argument fails to address the appropriate standard of review:

> Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction. The credibility of witnesses is an issue to be resolved by the jury; as long as there is substantial supporting evidence, we will not disturb their determination.

*State v. Scott*, 113 Ariz. 423, 424–25, 555 P.2d 1117, 1118–19 (1976) (citation omitted).

This court is not empowered to impose its own determination as to the credibility of Woods and Ray in deciding a Rule 20 motion. The only question before this court is whether there was substantial supporting evidence, and we conclude that there was. McCrimmon and Minnitt told Woods they robbed the market with the "dude" who "set it up." Woods explained that McCrimmon and Minnitt had described Cha–Chi as "Martin. . . . Betty Christopher's boyfriend." Fong had worked at the El Grande within a year of the murders and his girlfriend was Betty Christopher. Fong's fingerprints matched prints found on the produce bags and one of the food stamps found near Gee, who had apparently been ringing up a last-minute sale when he was shot.

Queen E. Ray loaned McCrimmon her car on the night of the murders. Minnitt and Fong were with McCrimmon when he left with her car. About an hour later the trio returned without the car. Meanwhile, police investigating the scene found Ray's car abandoned three blocks from the El Grande Market. The car was not parked near the curb,

but was left mid-turn. The hood was warm to the touch, the doors unlocked, and the rear windows rolled down. McCrimmon's fingerprints were found on the outside of the driver's side window, and two sets of hand prints were found on the car's trunk.

The evidence is more than sufficient to withstand a Rule 20 motion for acquittal.

### C. The Fingerprint Evidence

Defendant contends his conviction cannot stand because it is based on fingerprints alone. This argument is premised on defendant's assertion that the other evidence against defendant should first be discounted on a credibility basis. As noted above, credibility is not a question to be decided de novo by this court, so defendant is wrong in his assertion that fingerprints are the only evidence supporting his conviction. We decline to reach this hypothetical question because the factual premise does not apply here.

### Death Penalty Eligibility Issues

**I. Does the evidence support the findings that the murders were committed in an especially heinous, cruel or depraved manner under A.R.S. § 13–703(F)(6)?**

#### A. Overview

The trial court first concluded that it was unable to make a finding of physical cruelty because the evidence did not establish the sequence of shots with respect to any of the victims. However, the trial court went on to make alternative findings, the essence of which was: if a victim was shot in the head first, later shots to the victim's body would be gratuitous violence (which could be weighed in determining whether the murders were especially heinous or depraved), but if a victim was shot in the body first and then in the head, the victim suffered physical cruelty within the meaning of (F)(6). In part based on this alternative finding of gratuitous violence, the trial court found each murder to be especially heinous or depraved. The trial court also found the murders of Huang and Arriola to be especially cruel by reason of mental suffering. Lastly, the trial court stated that, even if the alternative finding of gratuitous violence were excluded, all three

murders were especially heinous and depraved.

Alternative findings of the type made here (that the murders were either physically cruel or involved gratuitous violence) are insufficient to support a finding beyond a reasonable doubt of a statutory (F)(6) aggravator. Therefore, they are set aside. We also hold that the evidence in this case does not support a finding of physical cruelty as to any of the victims as that term is defined in (F)(6). Nor does the evidence support the trial court's findings of mental cruelty as to the murders of Huang and Arriola within the meaning of (F)(6). Lastly, it is our conclusion that the trial court's separate findings of heinousness or depravity (after excluding gratuitous violence) are insupportable under the facts of this case. Our analysis follows.

### B. The Alternative Findings on Physical Cruelty and Gratuitous Violence

 In deciding whether a murder is especially cruel, this court looks to the physical or mental pain suffered by the victims. *See State v. Gretzler,* 135 Ariz. 42, 51, 659 P.2d 1, 10, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). To support a finding of gratuitous violence, the evidence must show violence beyond that necessary to fulfill the criminal purpose. *See Gretzler,* 135 Ariz. at 52, 659 P.2d at 11. Of course, this court independently reviews the record to determine whether the facts establish the aggravating factor beyond a reasonable doubt. *State v. Walton,* 159 Ariz. 571, 587, 769 P.2d 1017, 1033 (1989), *aff'd* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

 The trial court stated in its special verdict that "the evidence does not establish conclusively the sequence of shots with respect to any of the three victims and, therefore, the Court is unable to make a finding of physical cruelty...." However, the trial court went on to find

> in the alternative, that if the gunshot wounds to the head were inflicted first ... the additional gunshot wounds to the person of each of the three victims constitutes gratuitous violence.... On the other hand, the Court finds that if the gunshot

wounds to the head were inflicted last, thereby rendering the victims almost immediately unconscious, each victim would have suffered tremendous physical pain.... This would support a finding by this Court that the offenses were especially cruel from a physical point of view. Defendant contends that the trial court erred in its "alternative findings."

■■■ We do not believe that an alternative finding based on a hypothetical set of facts can serve to death qualify a defendant under (F)(6). A trial court must determine whether an aggravating factor has been proven beyond a reasonable doubt. *See Walton*, 159 Ariz. at 586, 769 P.2d at 1032. The specified statutory aggravators in Arizona's death penalty scheme are designed to narrow, in a constitutional manner, the class of first degree murderers who are death-eligible. If proof of an aggravator does not rise to the necessary standard, the aggravator has not been proven and may not be considered at sentencing. *Id.* at 587, 769 P.2d at 1033.

■■■ The (F)(6) aggravating circumstance has several components (cruelty, heinousness, and depravity). Proof beyond a reasonable doubt of any one of them justify a finding of the (F)(6) aggravator. *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. The circumstance is not proven if none of the individual component parts has been proven beyond a reasonable doubt. To conclude that a murder would be especially cruel or heinous if committed in an assumed manner, without evidence that it was committed in that manner, falls short of the mark. To say that the murder must have been either physically cruel or gratuitously violent involves, as this case demonstrates, a different and lesser burden than does proof that the murder *was* physically cruel or was gratuitously violent. Approval of alternative, hypothetical findings might jeopardize the constitutionality of Arizona's death penalty scheme and would set a most unfortunate precedent. Statutes should be construed so as to preserve their constitutionality wherever possible. *Hayes v. Continental Ins. Co.*, 178 Ariz. 264, 272–73, 872 P.2d 668, 676–77 (1994). Accordingly, we hold that the trial court's alternative findings of physical cruelty or gratuitous violence cannot stand.

## C. Physical Cruelty

On appeal, the state advances arguments (also made at sentencing) that, it contends, would independently support findings of physical cruelty with respect to each victim. These arguments were not accepted by the trial court and we find them unpersuasive.

■■■ Fred Gee was shot in the head and in the chest with a .25 caliber automatic handgun. The medical examiner did not testify as to which shot was the cause of death. The state claims that Gee "was obviously shot in the chest as he stood behind the liquor counter register ...," and therefore that Gee experienced physical suffering before he was killed by the shot to his head. In support of this proposition, the state cites to a single page in the record which discusses Gee's wounds but not the order of the wounds. The state also cites to Defendant's Exhibit E, which is a picture, from the neck down, of Mr. Gee. The picture does not even show the head wound, let alone prove that it was inflicted last. We can find no evidence which supports the state's "obvious" conclusion that Fred Gee's murder involved physical suffering of the kind that would make it **especially** cruel.

■■■ Raymond Arriola was shot in the head and in the abdomen. The shot to the abdomen was from a .25 caliber gun, and the shot to the head appeared to be from a .38 caliber gun. The medical examiner testified that the shot to the head would have rendered the victim unconscious within a second and that he could not determine which of the two shots (head or abdomen) came first, although they appeared "to have been caused at about the same time." The state contends that the abdominal shot came first because it was fired by a .25 caliber gun, which Woods testified Fong used. Woods' testimony indicated that Fong began shooting with the .25 caliber handgun, and McCrimmon and Minnitt entered the store when they heard the shots. Minnitt, armed with a .38, "shot one, and he shot another one that was laying down."

Zewan Huang was shot three or four times; the examiner testified that Huang's death was due to gunshot wounds in the head, back, chest, and arm, but he was unable to determine whether the wounds were inflicted by four shots or three. Police recovered three bullets from the body; the bullets from the chest and back were .25 caliber bullets, and the bullet from the head was a .38 caliber.

Woods' testimony does not establish beyond a reasonable doubt that both .38 caliber shots were fired after all of the .25 caliber wounds were inflicted. It is entirely possible that Minnitt entered after Fong's first three or four shots (two at Fred Gee and one or two at Huang and/or Arriola), shot one unwounded victim in the head, and then shot another wounded victim. Because the medical examiner did not testify whether Huang would have been conscious after the infliction of the first two (or three) .25 caliber shots, one reasonable inference is that Fong killed Gee, then shot Huang two (or three) times, and shot Arriola right after Minnitt had killed him with a shot to the head. Because Huang, on these facts, might well have been unconscious after the first shot, physical suffering was not proven beyond a reasonable doubt.

■ Moreover, we note that the alternative findings, and many of the state's arguments on appeal in support of an (F)(6) finding of physical cruelty, appear to be based on the assumption that a murder is especially cruel whenever the victim remains conscious for some moments after being shot. We find this assumption to be flawed.

In *Gretzler*, this court cited *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978), for the definition of "cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic." 135 Ariz. at 51, 659 P.2d at 10. We also provided two examples of murders which were especially cruel because they caused physical suffering, *Knapp* and *Mata*. *Id.* (citing *State v. Knapp*, 114 Ariz. at 543, 562 P.2d at 716; *State v. Mata*, 125 Ariz. 233, 609 P.2d 48, *cert. denied*, 449 U.S. 938, 101 S.Ct. 338, 66 L.Ed.2d 161 (1980)). In *Knapp*, the de-

fendant "burned to death his two infant daughters," and in *Mata*, "the killers performed successive rapes and severe beatings on the victim prior to murdering her." *Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. In *Gretzler*, however, this court also indicated that all murders are not especially cruel by citing to *Ortiz, Bishop, Clark*, and *Ceja* as cases in which "there [was] no evidence that the victims actually suffered physical or mental pain prior to death, or ... the evidence presented [was] inconclusive...." *Id.* (citing *State v. Ortiz*, 131 Ariz. 195, 210, 639 P.2d 1020, 1035 (1981), *cert. denied*, 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982); *State v. Bishop*, 127 Ariz. 531, 534, 622 P.2d 478, 481 (1981); *State v. Clark*, 126 Ariz. 428, 436, 616 P.2d 888, 896, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980); *State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980)).

In *Ortiz*, we held physical suffering was not proven beyond a reasonable doubt because, although the defendant stabbed his victim multiple times and burned her body, the pathologist could not determine whether the victim was alive when she was burned. 131 Ariz. at 199, 210, 639 P.2d at 1024, 1035. In *Bishop*, we held (F)(6) cruelty had not been established where the victim was killed with multiple blows from a claw hammer and the medical expert testified that the victim was unconscious of pain "immediately after the blows to the head." 127 Ariz. at 534, 622 P.2d at 481. In *Clark*, this court held a cruelty finding to be inappropriate because "the fatal wounds appear to have been delivered at vital parts of the bodies of the victims, and death ensued swiftly." 126 Ariz. at 436, 616 P.2d at 896. Finally, in *Ceja*, where the defendant shot two victims several times, this court held "that the evidence [was] inconclusive as to whether the victims suffered in such a way as to support a finding that the crime was committed in a cruel manner." 126 Ariz. at 36–37, 39, 612 P.2d at 492–93, 495.

The facts in this case resemble those of *Ortiz, Bishop, Clark*, and *Ceja* far more than they do the facts of *Knapp* or *Mata*. As in *Ortiz, Clark*, and *Ceja*, the evidence is inconclusive as to whether any of the victims

suffered before becoming unconscious. Moreover, as in *Ortiz, Bishop,* and *Ceja,* the evidence indicates the murders were committed by swift and successive blows.

Nor do the cases cited by the state support the conclusion that these murders (although horrible and repugnant as most murders are), are especially cruel murders within the statutory and constitutional meaning of (F)(6). The state notes that "[a] murder victim need not be physically tortured for a murder to be especially cruel" and cites *State v. Lopez,* 175 Ariz. 407, 857 P.2d 1261 (1993), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994), and *State v. Lavers,* 168 Ariz. 376, 814 P.2d 333, *cert. denied,* 502 U.S. 926, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991). In *Lopez,* the victim "was stabbed 23 times. . . . Her throat was cut. She was sexually assaulted and had semen in both her vagina and anus. . . . This grisly and ultimately fatal nightmare lasted from three minutes to as long as 15 minutes." 175 Ariz. at 411, 857 P.2d at 1265. In *Lavers,* the defendant killed his wife and her daughter by first cutting the daughter on the wrist with a knife and then stabbing his wife in the back, paralyzing her. 168 Ariz. at 380–82, 814 P.2d at 337–39. When the police arrived, they found the daughter still alive and bleeding profusely from a chest wound. *Id.* The mother lived for several more hours before the defendant finally shot her through the top of her head. *Id.*

We do not mean to suggest a bright-line, arbitrary temporal rule must be met before a finding of cruelty can be sustained. However, the assumption underlying the trial court's alternative findings in this case and the state's arguments on appeal would lead to findings of physical cruelty in all but the most exact, most precise, and most uncommon of murders. This approach would run counter to the constitutional narrowing function of (F)(6). Instead, we follow the implicit rule of *Ortiz, Bishop,* and *Ceja,* that where shots, stabbings, or blows are inflicted in quick succession, one of them leading rapidly to unconsciousness, a finding of cruelty, *without any additional supporting evidence,* is not appropriate. Having concluded that the trial court's findings of physical cruelty must

be set aside, we proceed to an examination of the trial court's other (F)(6) findings.

### D. Mental Cruelty (Huang and Arriola)

 Defendant also challenges the trial court's finding that the victims Huang and Arriola suffered mental cruelty within the meaning of (F)(6). The trial court's theory was that this suffering occurred during a time lapse between the shooting of Gee and the shootings of Huang and Arriola. Our cases hold that a killing is especially cruel if the victim suffers mental anguish by watching or hearing the defendant kill another person. *See State v. Runningeagle,* 176 Ariz. 59, 65, 859 P.2d 169, 175, *cert. denied,* 510 U.S. 1015, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993); *State v. Kiles,* 175 Ariz. 358, 372, 857 P.2d 1212, 1226 (1993), *cert. denied,* 510 U.S. 1058, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *State v. Greenway,* 170 Ariz. 155, 166, 823 P.2d 22, 33 (1991); *State v. Lavers,* 168 Ariz. at 392, 814 P.2d at 349. However, in each of these cases, the victim watched or heard either a parent or a spouse killed while the victim awaited his or her own fate. More importantly, none of these cases involved the rapid type of murders involved here.

Were there evidence that the trio had forced a victim to wait while the other victims were shot, the state might have a valid mental cruelty argument. On the facts presented in the briefs and at trial, however, when Fong began shooting, he was quickly joined by Minnitt, and the three victims were killed in rapid succession without any appreciable time to contemplate their fate.

The state contends that Arriola played dead to elude his attackers, thus establishing that he had time to contemplate his fate. The evidence does not establish this fact beyond a reasonable doubt. The evidence establishes that the killers **thought** one of the victims (it appears unknown which one) was playing dead when shot by Minnitt. If it was Huang, it is possible that he was already unconscious when shot and merely appeared to be playing dead. *See supra* Death Penalty Eligibility Issues I.A. If it was Arriola, it is entirely possible that he was lying on the floor in a state of shock and unaware of what was about to occur. Even assuming Arriola

played dead for a brief few moments, the evidence still points toward very rapid murders. Given the haste with which the trio exited the scene, it is unreasonable to assume that they lingered before their last shots. The evidence precludes us from making a finding beyond a reasonable doubt that Huang and Arriola suffered especially cruel deaths within the meaning of (F)(6).

## E. Heinousness or Depravity
### 1. Gratuitous Violence

As previously noted, the trial court made an alternative finding that if the murders were not especially cruel they must have involved the infliction of gratuitous violence, because the additional shots were unnecessary. This alternative finding assumes that shots to the body shortly after a shot to the head would constitute gratuitous violence, an assumption which is probably not supported by our cases. *State v. Amaya–Ruiz,* 166 Ariz. 152, 159, 178, 800 P.2d 1260, 1267, 1286 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991) (finding gratuitous violence where the victim was stabbed twenty-three times and shot in the ear); *State v. Comer,* 165 Ariz. 413, 416, 429, 799 P.2d 333, 336, 349 (1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991) (finding gratuitous violence where the defendant shot the victim in the head with a .38 caliber revolver and "later" stabbed the dead or dying victim in the throat); *State v. Ceja,* 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980) (finding gratuitous violence where defendant shot the female victim twice in the chest, dragged her to another room, shot her three more times, then shot his male victim three times, shooting him once in the back after he fell and kicking him in the face repeatedly after he was unconscious or dead); *State v. Brookover,* 124 Ariz. 38, 40–41, 601 P.2d 1322, 1324–25 (1979) (holding that shooting the victim twice in the back was not particularly cruel or depraved); *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), *cert. denied,* 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979) (gratuitous finding not supported by evidence showing the defendant shot the victim four times in the back); *State v. Blazak,* 131 Ariz. 598, 604–05, 643 P.2d 694, 700–01, *cert. denied,* 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982) (holding that the shooting of a bar owner and a patron during the course of a robbery was not heinous or depraved). However, we need not belabor the point, because we have addressed and rejected the trial court's alternative approach to aggravating factors in connection with our discussion of physical cruelty, and the same considerations apply to gratuitous violence. We therefore set aside the alternative findings of gratuitous violence with respect to all three victims. Because the trial court indicated that it independently found the murders to be especially heinous or depraved even without the alternative finding of gratuitous violence, we consider the other factors found by the trial court.

### 2. Witness Elimination

The trial court found that the murders were heinous and depraved in part because they were committed for purposes of witness elimination. This finding was made without benefit of this court's later opinion clarifying and narrowing the witness elimination factor in *State v. Ross,* 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). Under *Ross,* the witness elimination factor may only be found where: (1) "the murder victim is a witness to some other crime and is killed to prevent that person from testifying about the other crime;" (2) the defendant states "that witness elimination is a motive for the murder;" or (3) "where extraordinary circumstances of the crime show, beyond a reasonable doubt, that witness elimination is a motive. This will only occur in the most extreme case."

The first two factors are clearly not present here, but the state argues that this is the type of case in which the third *Ross* factor is present. That factor, however, requires a very high level of proof found only in the most "extreme" cases. This case does not meet the test. Woods' testimony, at least in part, indicates that the murders were part of a botched robbery that went bad when one of the victims "rebelled." Based upon this record, it cannot be said beyond a reasonable doubt that the murders represent the "ex-

treme" case of a calculated decision to kill in order to eliminate witnesses.

### 3. Senselessness and Helplessness

■ With regard to the *Gretzler* factors, the trial court found that the murders, although motivated by pecuniary gain, were senseless,[10] and that the victims (particularly Mr. Huang) were helpless. Because we have set aside the findings of gratuitous violence and witness elimination, only the findings of helplessness and senselessness support the (F)(6) finding.

Defendant argues that senselessness of the murder and helplessness of the victim by themselves are not sufficient to support an (F)(6) finding and cites *State v. Ross,* 180 Ariz. 598, 607, 886 P.2d 1354, 1363 (1994), *cert. denied,* — U.S. —, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995). The state, on the other hand, contends that a finding of senselessness or helplessness may be sufficient to support a finding of heinousness or depravity "under the facts of a particular case or when found together."

The cases to which the state refers in support of its position are inapposite here. Two of those cases indicate that senselessness and helplessness are not usually sufficient to establish heinousness or depravity. *See State v. Barreras,* 181 Ariz. 516, 523, 892 P.2d 852, 859 (1995); *State v. Smith (Bernard),* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985). Three of the other cases cited by the state are critically distinct from the instant case because they involved murders by a parent (or caregiver) of a child (or dependent) and/or they involved the murder of a very young child. *See State v. Styers,* 177 Ariz. 104, 116, 865 P.2d 765, 777 (1993), *cert. denied,* 513 U.S. 855, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994); *State v. Milke,* 177 Ariz. 118, 126, 865 P.2d 779, 787 (1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); *State v. Lopez (George),* 174 Ariz. 131, 144, 847 P.2d 1078, 1091 (1992),

*cert. denied,* 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993).

The final case cited by the state, *State v. Correll,* 148 Ariz. 468, 715 P.2d 721 (1986), also involves facts wildly divergent from those involved here. In *Correll,* the defendant and an accomplice robbed the mobile home of one of the accomplice's co-workers. *Id.* at 472, 715 P.2d at 725. During the robbery, they tied up the four occupants of the trailer. *Id.* They took three of the occupants to the desert and shot and killed two of them, although the third survived a shot to the head. *Id.* They then returned to the trailer and strangled the fourth victim. This court held that the murders were heinous and depraved because they were senseless murders committed against helpless victims and motivated solely by a desire to eliminate any witnesses to the robbery. *Id.* at 481, 715 P.2d at 734.

Significantly, in *Correll,* this court held that witness elimination was "[t]he only reasonably ascertainable motive for the murders...." *Id.* As we have already noted, witness elimination may not be used as a factor in this case. Additionally, in *Correll,* the victims were bound and gagged and killed one by one. *Id.* The murders were not committed quickly during the confusion and potential conflict of an armed robbery of a store, as in this case.[11] The murderers in *Correll* even took the time to drive from the desert back to the mobile home to strangle their final victim.

The facts in this case resemble far more closely those in *Ross.* In that case, the defendant met a real estate agent at a property, attempted to take the agent's wallet and, during the ensuing struggle, shot his victim in the head. 180 Ariz. at 601, 886 P.2d at 1357. He then dragged the victim behind the counter and shot him again in the head. *Id.* Although this court held that the murder was senseless and committed against a helpless victim, the factors were not enough

---

10. It is unnecessary to decide in this case whether a murder may be both senseless and motivated by pecuniary gain.

11. The testimony of Keith Woods indicates that Fred Gee "rebelled in some kind of way." Although this testimony may conflict with Woods' testimony that the trio planned to kill the victims before they entered the store, it cannot be said beyond a reasonable doubt that the three murders in this case were committed in as senseless a fashion or against as helpless victims as those in *Correll.*

"to prove the murder was heinous or depraved beyond a reasonable doubt." *Id.* at 606–07, 886 P.2d at 1362–63.

Like *Ross,* this case involved a quick succession of gunshots during a robbery (which, according to Woods' testimony, may have involved unexpected resistance on the part of the victims). Obviously, one cannot condone these reprehensible murders. However, our duty is not to determine whether the murders were vicious crimes but whether they were **especially** cruel, heinous, or depraved according to the meaning of those terms as used in the statute. We have held that "[o]nly in limited circumstances will a finding of senselessness and helplessness, without more, support a finding of heinousness and depravity." *State v. Hyde,* 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996) (citing *State v. King,* 180 Ariz. 268, 287, 883 P.2d 1024, 1043 (1994), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995)). This case does not present such unique or limited circumstances.

## II. Does receipt of testimony concerning Minnitt's and McCrimmon's statements preclude the death penalty?

Defendant argues that "[t]he inculpatory hearsay accusations of McCrimmon and Minnitt are the springboard to Appellant's capital sentencing in several respects" because the trial court relied on the statements in making its *Enmund–Tison* finding, in determining that the murders were committed for pecuniary gain under A.R.S. § 13–703(F)(5), and in determining that the murders were especially cruel, heinous, or depraved under A.R.S. § 13–703(F)(6).

Defendant's argument here is identical to Trial Issue I, *supra,* except that defendant goes on to argue that if the evidence was improperly admitted at the guilt phase, it was also improperly considered at the sentencing phase. Because the evidence was properly admitted, this argument fails. *See* discussion *supra* Trial Issue I.

## III. Can defendant's death sentence withstand review of the credibility of Woods and the veracity of McCrimmon and Minnitt?

█ Defendant invites this court to set aside his death penalty because of the alleged unreliability of Woods, Minnitt, and McCrimmon. He claims that Woods' unreliability is "self-evident" and that McCrimmon and Minnitt indulged in blame-shifting in their conversation with Woods. In support of his contention that McCrimmon and Minnitt were the ringleaders of the El Grande robbery, defendant refers to his "McCrimmon/Minnitt Factsheet" which shows that McCrimmon and Minnitt were older than he, that they both had longer criminal records than he, and that, unlike he, they each had been involved in a botched robbery/shooting (the "Mariano Pizza Case"). "From these additional facts," defendant posits, "it is reasonable to infer that it was McCrimmon and Minnitt, not [Fong], who master-minded and planned the El Grande robbery."

As we have already noted, the issue of credibility is not an issue to be decided *de novo* by this court. *See supra* Trial Issue V. The issue of sufficiency of the evidence has also been addressed above. *See supra* Trial Issues III–V.

## IV. Does the evidence support the finding of pecuniary motive under A.R.S. § 13–703(F)(5)?

█ The trial court found the statutory aggravating circumstance of pecuniary motive applied. This factor applies if a murder is committed "as consideration of the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13–703(F)(5).

Defendant argues that the state did not prove this factor beyond a reasonable doubt. Specifically, he contends that evidence of a motive of pecuniary gain came from the allegedly unreliable hearsay testimony of Keith Woods and from the allegedly legally insufficient and unreliable testimony of Richard Gee, the market owner's brother. Defendant points out that $6,000 was left in the market "in locations which would be open and obvious to a former employee," and that none of the "wallets, jewelry or monies" of the victims was taken. Finally, defendant asserts that, given the lack of evidence supporting pecuniary gain and the alleged threat made

to Free Gee, *see* discussion *supra* Trial Issue V, it was more likely that the killings were related to "the high incidence of random shootings or gang initiation violence in American society...."

■ To establish the A.R.S. § 13–703(F)(5) factor, "the evidence must show that the hope of financial gain supplied the impetus for the murder." *State v. Robinson*, 165 Ariz. 51, 60, 796 P.2d 853, 862 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1025, 112 L.Ed.2d 1107 (1991). This court has upheld a finding of pecuniary gain where circumstantial evidence strongly supported the trial judge's finding of the (F)(5) aggravating circumstance. *State v. Schad*, 163 Ariz. 411, 420–21, 788 P.2d 1162, 1171–72 (1989), *aff'd*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). However, "[t]he trial court may not find pecuniary gain in every case in which 'a person has been killed and at the same time defendant has made a financial gain.'" *State v. Spears*, 184 Ariz. 277, 292, 908 P.2d 1062, 1077 (1996) (quoting *State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986)).

Substantial evidence demonstrated that the El Grande murders were committed as part of a plan to rob the market, the impetus of which was pecuniary gain. For example, Woods testified that McCrimmon and Minnitt told him $300 was "all he [sic] got for doing it," and that they split the money three ways. Also, the evidence showed that at least $175 was missing from the store.

Defendant contends that the fact that a large amount of money was left in the store negates a finding of pecuniary gain. However, the money that was left was kept by Gee in cigarette cartons behind the counter which detectives did not discover for some time, and even then only fortuitously. There is no evidence showing that Fong, although he had been a previous employee, knew where Gee kept the money which was removed from the registers. Similarly, defendant's argument that jewelry and wallets were not taken does not negate the pecuniary gain finding. Pecuniary gain does not focus on whether the defendants were effective or thorough robbers, but on whether their motive was financial gain.

Lastly, defendant points to Woods' testimony that it was the intent of the trio to kill the victims even before they entered the store. However, the fact that the trio intended to murder in no way precludes the fact that they also intended to rob. The trial court was justified in concluding that the murderers had a pecuniary motive and, based upon our review of the record, we agree with that finding.

## V. Is the aggravating factor A.R.S. § 13–703(F)(8) (multiple homicides) unconstitutional on double jeopardy grounds?

Defendant raised, as part of his discussion of age as a mitigating factor, the unrelated question of whether his death sentence is invalid because it is based on the aggravating circumstance found at A.R.S. § 13–703(F)(8), which applies to "multiple homicides committed during the same offense." Defendant acknowledges that his argument is based on the same double jeopardy objections that this court rejected in *State v. Greenway*, 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991). We decline to revisit the issue.

## VI. Is defendant's age (17) a constitutional bar to his death sentence?

■ Defendant acknowledges that the U.S. Supreme Court held in *Stanford v. Kentucky*, 492 U.S. 361, 380, 109 S.Ct. 2969, 2980, 106 L.Ed.2d 306 (1989), that the death penalty may constitutionally be imposed on sixteen- or seventeen-year-old offenders, but contends that a national consensus has evolved that reflects a trend toward imposing a statutory minimum age of eighteen for death penalty eligibility. In our recent case of *State v. Jackson*, 186 Ariz. 20, 918 P.2d 1038 (1996), we observed that no national consensus of the type alleged by defendant exists and expressly stated that "we have found 'no constitutional authority or statutory provision [that] prohibits the sentencing of a 16–year–old to death.'" *Id.* at 25, 918 P.2d at 1043 (quoting *State v. Valencia*, 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979)).

## VII. Did the trial court improperly consider victim impact evidence?

■ Defendant argues that the trial court improperly allowed presentation of victim impact evidence, including a letter from the Gee family supporting imposition of the death penalty. The trial court stated on the record that it "has not and will not consider the victims' statements either in the presentence report or in open court as to aggravation on the first degree murder counts."

Defendant, relying on *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), as modified by *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), argues that a capital sentencing "authority" may not hear testimony from the victim's family requesting imposition of a death sentence. However, this court, after *Payne,* has held there is no reversible error when the sentencing **judge** indicates that family testimony will not be considered on the capital counts. *State v. Bolton,* 182 Ariz. 290, 315–16, 896 P.2d 830, 855–56 (1995). In *Bolton,* as in this case, a portion of the family's testimony addressed imposition of the death penalty. *Id.* at 315, 896 P.2d at 855. We held that "[a]bsent evidence to the contrary [this court will assume that] the trial judge in a capital case is capable of focusing on the relevant sentencing factors and setting aside the irrelevant, inflammatory, and emotional factors." *Id.* at 316, 896 P.2d at 856 (citing *State v. Atwood,* 171 Ariz. 576, 657, 832 P.2d 593, 674 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993)).

Defendant has not brought forth, as is his burden under *Bolton,* "evidence to the contrary." *Bolton* establishes that a death penalty is not voidable merely because a victim offers irrelevant testimony at sentencing so long as there is no evidence that the trial court improperly considered the testimony. *Id.* When, as in this case, the trial court explicitly states that it has not considered the testimony and there is no evidence to the contrary, there is no error.

### INDEPENDENT REVIEW

We have concluded that defendant was properly convicted on each of the counts on which he was convicted, including the three capital counts. We have set aside the findings that the murders were especially heinous, cruel or depraved under A.R.S. § 13–703(F)(6) and affirmed the findings that the murders were committed with pecuniary motive, A.R.S. § 13–703(F)(5), and that multiple homicides were involved, A.R.S. § 13–703(F)(8).

■ Having found defendant death-eligible but also having set aside one statutory aggravator, we must determine the appropriate disposition. To do so, we first conduct an independent review of the mitigating factors. The defendant must prove the existence of mitigating circumstances by a preponderance of the evidence, and is not bound by the rules of evidence in admitting mitigating evidence. A.R.S. § 13–703(C).

### I. Age

We have previously considered and rejected defendant's contention that his age at the time of the crime is an absolute constitutional bar to his execution. However, defendant also advances his age as a statutory mitigator. The trial court found defendant's age was a mitigating factor and we agree.

Defendant was seventeen years and eight months old at the time of the murders. He notes that his "lifestyle in the relevant time centered around family matters.... [Fong] who had dropped out of high school, worked with his father at Liberty Drywall, lived at home with his parents and girlfriend, and dutifully gave his paycheck to his mother." Defendant also notes, however, that "approximately a month before the El Grande homicides, [Fong] and his pregnant girlfriend, Betty Christopher, got an apartment of their own. Nonetheless, [Fong] maintained his daily work habits with his father and several times a week continued to eat dinner at the parents' home."

The trial court cited many of the same facts upon which defendant relies when it found that, although the defendant's age did constitute a mitigating circumstance, it was not sufficiently substantial to call for leniency:

First, the Defendant was living on his own with his common law wife, Betty Christopher, at the time of these offenses. Second, he was able to function in an adult-like manner insofar as he was at least able to provide some support for himself and his common law wife. He was able to hold a job, make money and devote that money to the welfare of his family. Although he had a loving and caring family, he rejected his family relationship, ignored the fact that he was about to have a child and, instead, chose to engage in criminal activity which culminated in the death of three innocent people.

In *State v. Jimenez*, 165 Ariz. 444, 799 P.2d 785 (1990), this court decided that the defendant's age, seventeen years and two months, was not, in itself, of such substantial weight as to require leniency when balanced against two aggravating factors. 165 Ariz. at 456, 799 P.2d at 797. In the recent case of *State v. Jackson*, we held that although Jackson's age, sixteen years and ten months at the time of the crime, was a mitigating factor, it was not sufficiently mitigating so as to call for leniency in that case. 186 Ariz. 20, 32, 918 P.2d 1038, 1050 (1996). In *Jackson*, we looked to the maturity and intelligence of the defendant and his level of participation in the crime (among other considerations) to determine what mitigating weight to assign to his age. *Id.*

In this case, pursuant to our independent review, we hold that defendant's age is of some mitigating weight. However, defendant was almost an adult at the time of the crime. His maturity and intelligence, as evidenced by his ability to live on his own with his own family, and his major participation in this offense (as the person who gained entry to the store and fired the first gunshots) substantially reduce any mitigating weight his age might have.

## II. Residual Doubt

Defendant claims that the trial court erred in not considering residual doubt as a mitigating circumstance. Under the facts of this case, the contention has no merit. *State v. Atwood*, 171 Ariz. 576, 653, 832 P.2d 593, 670 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

## III. Other Mitigation

Defendant contends that the following additional mitigation compels leniency: (1) close family ties; (2) the giving of a felony murder instruction; (3) lack of a criminal record; (4) significant employment history; (5) exemplary behavior at trial; and (6) the availability of a "true life" sentence. Although defendant has the burden of proving mitigation, he simply lists these factors without argument, maintaining that space limitations preclude argument. We are unpersuaded by his reasons for not complying with the rules but, nevertheless, in accordance with our responsibility to independently review, we have reviewed the record with respect to each item of tendered mitigation.

### A. Close Family Ties

The trial court found that defendant "rejected his family relationship." It is not mitigation that defendant, a seventeen-year-old with a pregnant girlfriend and a separate home, often ate dinners with his family. It is certainly not of such mitigating force that it requires leniency. *See State v. Bible*, 175 Ariz. 549, 606, 858 P.2d 1152, 1209 (1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

### B. Felony Murder Instruction

The giving of a felony murder instruction "is not relevant 'where the defendant intended to kill the victim or where the defendant knew with substantial certainty that his conduct would cause death.'" *State v. Styers*, 177 Ariz. 104, 117, 865 P.2d 765, 778 (1993), *cert. denied*, 513 U.S. 855, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994) (quoting *State v. Zaragoza*, 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983)).

### C. Lack of Criminal Record

Defendant had no prior felony convictions. Given his age, he could not have had any prior felony convictions unless he had previously been transferred to adult court and convicted. However, he had a history of

misdemeanor arrests as a juvenile. Under these circumstances, we find no mitigation in the fact that defendant has no prior adult felony record. *See State v. Herrera*, 174 Ariz. 387, 399, 850 P.2d 100, 112 (1993).

### D. Employment History

The trial court recognized, as mitigation, the fact that defendant "was gainfully employed for at least some of those periods of time that he was not in school," yet determined that this mitigation did not justify leniency. The trial court's conclusion is the correct one. *See Herrera*, 174 Ariz. at 399, 850 P.2d at 112. It would be anomalous in the extreme to reward Fong for his employment history at the El Grande Market.

### E. Behavior at Trial

 The trial court correctly recognized that Fong's behavior at trial was not relevant to mitigation because it "says nothing about his character, tendencies, or rehabilitative potential." *State v. Spencer*, 176 Ariz. 36, 44, 859 P.2d 146, 154 (1993).

### F. Availability of "True Life" Sentence

 Defendant argues that because he committed other crimes subjecting him to potential consecutive sentences, the availability of those consecutive sentences should be considered mitigating. The state responds that if that argument is accepted, all murders committed after the effective date of A.R.S. § 13–703(A), the "real life" statute, would also automatically involve a mitigating factor. The availability of a "real life" sentence is not, in our opinion, a mitigator, although it may be appropriate to consider as an alternate sentence in an appropriate case.

### CONCLUSION AND DISPOSITION

 We have set aside one aggravating factor, A.R.S. § 13–703(F)(6) (especially heinous, cruel or depraved), and affirmed two aggravating factors, A.R.S. § 13–703(F)(5) (pecuniary gain) and A.R.S. § 13–703(F)(8) (multiple homicides). We have found one statutory mitigator: defendant's age. When an aggravator is set aside on appeal but others are affirmed and the mitigating evidence is *de minimis*, a remand for resentencing is unnecessary. *See State v. Bible*, 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). *See also* A.R.S. § 13–703.01.[12]

We conclude that the mitigating evidence in this case is *de minimis*. As we have previously discussed, defendant's age in this case was nearly that of an adult. Additionally, defendant was a major participant in the crimes and has demonstrated his maturity through his decision to live away from his parents and start a family. In some cases age may, of course, be a substantial mitigator. Under the facts of this case and the presence of two statutory aggravators in our weighing process, we, like the trial court, conclude that the mitigation is not substantial enough to call for leniency. We affirm the convictions and the sentences.

FELDMAN, C.J., and ZLAKET, Vice C.J., and MARTONE, J., concur.

---

12. This statute was enacted during the appeal process in this case and is not referred to in the briefs. Because we are affirming the sentence pursuant to procedures established by our preexisting case law, we do not discuss or consider the statute.