IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 26, 2024 Session

## STATE OF TENNESSEE  v. HORACE ANDREW TYLER NUNEZ

**Appeal from the Criminal Court for Knox County**
**No. 118599   Kyle A. Hixson, Judge**

_____

**No. E2023-00193-CCA-R3-CD**
_____

A Knox County jury convicted Horace Andrew Tyler Nunez, Defendant, of one count of first degree premeditated murder and four counts of reckless endangerment.  On appeal, Defendant advances multiple arguments related to: admissibility of evidence; improper jury communications; sufficiency of the evidence; failing to instruct the jury on voluntary manslaughter; and sentencing.  The State argues: the trial court did not err, or alternatively, any error was harmless; the evidence was sufficient; and the sentence was proper.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Eric Lutton, District Public Defender; Jonathan Harwell, Assistant Public Defender (on appeal); John Halstead, Assistant District Public Defender (at trial), for the appellant, Horace Andrew Tyler Nunez.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Joanie Stallard Stewart, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural History

On February 24, 2021, a Knox County Grand Jury returned a presentment charging Defendant with one count of the first degree premeditated murder of Nikita Nunez ("Ms. Nunez"), his wife, and four counts of reckless endangerment of his children and stepson. Before trial, both Defendant and the State filed a number of pretrial motions. As relevant to this appeal, the State filed a motion in limine seeking to exclude evidence of any prior bad acts, wrongs, or crimes of Ms. Nunez under Tennessee Code Annotated section 24-7-125. It also moved to prevent Defendant from introducing certain statements he made while receiving medical care during his case-in-chief, contending that the statements were hearsay. The trial court granted the State's motion as to Defendant's statements. The State also filed a notice of its intent to seek life without the possibility of parole, stating it would rely on the statutory factors of Defendant's prior felony convictions involving the use of violence and of the murder itself being especially heinous, atrocious, or cruel.

Defendant filed at least two pretrial motions in limine. In his first motion, Defendant, in pertinent part, requested the trial court to prohibit the State from introducing any statements or diary entries made by Ms. Nunez. Because the State did not intend to use the diary entries in its case-in-chief, the trial court held the issue in abeyance. In his second motion in limine, Defendant requested the trial court to exclude any evidence or testimony regarding an entry from Ms. Nunez's diary describing that about two weeks prior to her death, she had woken up to find Defendant with his hand on another woman's leg. Defendant also requested the trial court to exclude any evidence of prior acts of violence by Defendant against Ms. Nunez, and that the trial court exclude any shocking or gruesome photos. The trial court denied the second motion as it related to the photos but held the rest of the issues from the second motion in abeyance.

### A. Trial

In January 2021, Defendant and Ms. Nunez cared for four children, A.G., Z.N., S.N., and B.N.[1] Three of the children were Defendant's and Ms. Nunez's biological children, and A.G. was Ms. Nunez's biological child and Defendant's stepson. On January 31, 2021, Defendant and Ms. Nunez were celebrating Z.N.'s sixth birthday. A.G. was ten, S.N. was four, and B.N. was two. Z.N.'s birthday celebration started at their apartment where they

---

[1] It is this court's policy to protect the identities of underage victims. Thus, we will refer to the child victims in this case by their initials.

all lived together; Ms. Nunez's parents and grandmother were also there. Everyone went to Skatetown, a roller rink in the Fountain City area of Knoxville, to continue the celebration. Ms. Nunez drove her green minivan and Defendant drove a company truck.

After some time at Skatetown, Ms. Nunez's parents left, but as they were leaving, Defendant approached them and said Ms. Nunez is "your daughter and [Ms. Nunez] may not always get what she wants, but my kids will always be taken care of. You guys are stuck with me." After the children had skated for "a couple of hours," the party ended, and Defendant and Ms. Nunez got into a heated argument in the parking lot over Ms. Nunez's alleged marital infidelity. A.G. testified that on January 30, 2021, Ms. Nunez had left their apartment after Defendant came home from work and did not return until after A.G. was asleep. As Defendant and Ms. Nunez argued, A.G. got into Ms. Nunez's minivan and the three other children got into Defendant's company truck. Defendant and Ms. Nunez continued to argue over the phone as they drove back to their apartment.

Ms. Nunez arrived home first and sent A.G to retrieve his overnight bag since he was spending that night at his father's home. As A.G. exited the van, Defendant arrived and parked his truck from Ms. Nunez's minivan "about ten feet away. . . . towards the back" of the minivan. A.G. needed his mother's keys to enter the apartment, so gave them to him and he went inside alone to get his bag. When A.G. returned, Defendant was at Ms. Nunez's driver-side window "arguing" with Ms. Nunez, who was still in her minivan. The argument continued for several minutes and got loud enough to disturb neighbors. At some point, Ms. Nunez "rolled up the window and [Defendant] hit it and it broke."

After Defendant shattered the glass, he grabbed Ms. Nunez's phone and threw it across the parking lot. Ms. Nunez then told A.G. to "Call the cops," but the child's phone "was dead." Defendant repeated Ms. Nunez's statement "Call the cops," and "then went to his car and he grabbed the gun. . . . from the driver's side door." After Defendant grabbed the gun, he went to "[t]he driver's side door of [Ms. Nunez's] car. . . . Then he shot her." Defendant fired two shots quickly, paused for a few seconds, and then fired several more shots. During this time, A.G.'s siblings "were still in the truck," and "never got out of the truck."

Defendant then fled the scene in his truck with Z.N., S.N., and B.N. still inside. Surveillance footage from the apartment complex showed Defendant's truck leaving at 5:05 p.m. Defendant drove from the apartment in Knoxville to Rocky Top, Tennessee. Defendant's mother, Ms. Payne, testified that she received a call from Defendant around the time Defendant left the complex. From the call, Ms. Payne deemed Defendant's "emotional state" as "very confusing." Defendant kept speaking to himself "very roughly," and "[l]ike a monster." Defendant said "It's done. Get your stuff together, it's done." In the background of the call, Defendant kept apologizing to his children, but then he "would

cry like a little kid and you couldn't understand what he was saying." Ms. Payne tried to convince Defendant to meet her "without calling the police" so she could obtain her grandchildren from Defendant. Ms. Payne left work and stayed on the phone with Defendant "the whole time" until they met for Ms. Payne to get the children at a Pilot gas station in Rocky Top. As he was transferring the children, Ms. Payne testified that Defendant "collapsed in [her] arms and that's when he told" her what had happened. The three children were crying when Ms. Payne took them and drove them to her daughter's apartment. Ms. Payne then called the police.

After the shooting, officers with the Knoxville Police Department ("KPD") were attempting to locate Defendant. They contacted Defendant's employer, Solar Titan, and learned that the GPS feature on a company iPad that was in Defendant's company truck had been disabled. Solar Titan employees agreed to remotely access the iPad, and after they did, the "find my device" feature revealed the iPad was in Kentucky. KPD then reached out to Kentucky law enforcement to be on the lookout for Defendant's truck.

Investigators later learned that Defendant purchased brandy at a liquor store in Rocky Top using his company's credit card after shooting Ms. Nunez. The liquor store was "just about a block away" from the Pilot gas station where Defendant had dropped off his children with his mother. On the liquor store's surveillance video, Defendant appears casual and is speaking on his cell phone while flipping through his wallet when buying the brandy. KPD Investigator Preston Whillock telephonically interviewed the clerk at the liquor store, who said Defendant "seemed like an ordinary person making a purchase." Investigators also learned that at 7:55 p.m., Defendant bought socks, boxer briefs, pants, a top, and a hat at a Walmart in Lexington, Kentucky on the company card. Still shots from a Walmart surveillance video from the night show Defendant wearing a paper mask, speaking on his cell phone, and carrying his purchased items while he exited the store.

Also on the night of January 31, 2021, Defendant called a co-worker, John Bacon, and sounded "[c]ompletely distraught" and scared. They spoke for about thirty to forty minutes, and while Defendant "was quite hysterical right at the beginning," Defendant "relaxed up a little bit. He . . was just concerned about his children probably towards the end" of the phone call. Mr. Bacon did not know where Defendant was during the call because Defendant "wouldn't tell" him. After the call, Mr. Bacon's wife, who was "right beside" him, called 911.

That same night, Kentucky State Trooper Jacob Guffey observed Defendant's truck driving "erratically," at "low speeds, driving into the emergency lane sometimes, into the left-hand lane of traffic" on Interstate 64 around 9:11 p.m. The trooper clarified Defendant was driving forty-five to fifty miles per hour in a seventy miles-per-hour zone. The trooper attempted to stop Defendant with his "[l]ights and sirens" activated but Defendant "failed

- 4 -

to yield." This resulted in the trooper's pursuit of Defendant for about three miles until Defendant finally stopped in the middle of an exit ramp. The trooper instructed Defendant to exit the truck via his loudspeaker, but Defendant told the trooper he could not hear him and was scared. As other law enforcement officers arrived and attempted to get Defendant out of the truck, he abruptly drove off again. Defendant then struck a median divider at the end of the exit ramp, lost control of his truck, and ultimately, drove off the road and flipped his truck in an embankment. After the wreck, Defendant crawled out of the driver's side window which was "busted out" from the crash. Trooper Guffey apprehended Defendant and noticed that he smelled strongly of alcohol. Officers found a loaded Smith & Wesson 9 mm caliber handgun with five magazines, an iPad, and a phone. The phone was damaged and could not be downloaded by law enforcement. Defendant had a laceration above his eye and a possible burn from the truck's air bag, so he was transported to a hospital in Frankfort, Kentucky for medical treatment

Dr. Maxwell Rollins, the Assistant Medical Examiner for Knox County, performed an autopsy on Ms. Nunez's body to determine her cause of death. Before Ms. Nunez's body was removed by medical personnel, it was found in the driver's seat of her minivan, with her seatbelt still fastened. Dr. Maxwell testified Ms. Nunez was struck with a total of six shots—one bullet struck the back-left portion of Ms. Nunez's neck and exited through the front of her lower jaw; this bullet also struck her carotid artery. The exit and entry wounds from this bullet were consistent with Ms. Nunez turning away from Defendant towards the passenger side of her vehicle where A.G. was standing outside the passenger-side door, but the doctor could not determine from what distance the bullet was fired. Another bullet struck Ms. Nunez in the left jaw, traveled into her right brain, and lodged there. The stippling for the entrance wound of this bullet suggested it was shot from twelve to thirty-six inches away, and abrasions from the wound showed blood was still pumping in Ms. Nunez's body at the time of the shot. While the bullet lodged in Ms. Nunez's brain, the doctor said this shot was "[n]ot necessarily" fatal because it did not strike her brainstem. A third bullet struck Ms. Nunez's left side and perforated her lungs, but the distance from which it was fired could not be determined. A fourth bullet struck Ms. Nunez's chest but did not hit any organs; the doctor was able to recover that bullet for testing. A fifth bullet hit Ms. Nunez's left arm and the sixth bullet hit her right arm. The doctor testified that Ms. Nunez was "most likely . . . not rendered unconscious" immediately by these six bullets, however, their combination ultimately resulted in her death and the manner of her death was homicide.

At the scene of the shooting, investigators located six spent 9 mm caliber casings near the minivan. Examination of the shell casings revealed they had all been fired from the Smith & Wesson 9 mm caliber handgun recovered from Defendant's company truck. An unfired round, possibly from a jam or a misfire, was found on the scene. A 9 mm bullet was extracted from the pillar located between the front passenger side window and the rear

passenger compartment of the minivan. This bullet and the bullet taken from Ms. Nunez's chest were determined to have been fired from the handgun in Defendant's possession. Within Ms. Nunez's purse found in the van, investigators located another 9 mm pistol. None of the recovered casings or bullets recovered matched the pistol found in the purse.

Defendant elected not to testify on his own behalf. The jury found Defendant guilty as charged on all counts.[2]

### B. Sentencing Phase

The State introduced evidence of Ms. Nunez's journal through her grandmother, Jacqueline Corpening. These journal entries were from the time of Ms. Nunez's pregnancy with A.G. and reflected her excitement to become a mother. The State called Wayne Pack, Jr., a paramedic who responded to the scene of the shooting and attempted to treat Ms. Nunez. Mr. Pack testified that while he could not detect a pulse from Ms. Nunez, her heart still showed "pulseless electrical activity," so they took her to the hospital while attempting to use an automatic CPR machine on her. Hospital records for Ms. Nunez were introduced and according to those records, Ms. Nunez was declared dead at 5:39 p.m. The State called Oak Ridge Police Department Officer Lewis Ridenour, who previously had arrested Defendant for an aggravated robbery. The State introduced a certified copy of Defendant's indictment for aggravated robbery and a copy of the judgment for Defendant's conviction for facilitation of aggravated robbery. The State also introduced Defendant's guilty plea colloquy from the plea hearing. The stipulated facts showed that the victim was approached by two men with handguns who grabbed him and demanded money. The two men then robbed the victim of his wallet and fled on foot. Defendant and the State stipulated that the judgment was for Defendant.

Defendant introduced his medical records from Frankfort Regional Medical Center. The records contained statements Defendant made to a nurse who treated him. Defense counsel read aloud one portion that was recorded at 10:45 p.m. where Defendant stated to the nurse "I messed up tonight. I really messed up. I've F'ed up my life and my kids' life. I hurt my baby girl. She didn't deserve that." According to the records, Defendant began to cry and repeated, "I hurt my baby girl . . . bad" and indicated he meant his wife. He said he "lost his mind with anger," and that he knew his "life was over" once he shot her. He stated that he could not believe he had done this on his son's birthday.

After hearing the sentencing-phase proof, the jury determined that both of the identified statutory aggravators applied: (1) "The defendant was previously convicted of

---

[2] As stated above, the charges included one count of first degree murder and four counts of reckless endangerment.

one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;" and (2) "The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *See* Tenn. Code Ann. §§ 39-13-204(i)(2), (5). It then fixed Defendant's sentence as life without parole for the first degree murder conviction. *See id.* § 39-13-207(c).

Based upon the jury's findings, the trial court imposed a life without parole sentence for the murder conviction. The court further imposed a four-year sentence for each reckless endangerment conviction, merged them together, and ordered the sentences to run concurrently with Defendant's life without parole sentence.

## C. Motion for New Trial

On January 27, 2023, the trial court conducted a hearing on Defendant's motion for new trial.[3] At the hearing, Defendant raised an issue about the jury's request to adjourn for the night during its deliberations during the guilt phase of the trial. The trial court did not adjourn court that night and did not inform counsel of this communication. Defendant claimed "the court's actions in requiring the jury to continue deliberating after they had deliberated for several hours that day had the effect of forcing a verdict out of the jury." Defendant also argued "the trial court should have discussed the matter in open court." By not doing so, Defendant claimed, the trial court "violated [Defendant's] rights to due process and a fair trial."

In response to Defendant's claims, the trial court stated, "I recall that they had asked to leave at one point, but we were in the process of ordering dinner. So I informed them that we were going to continue with that process. They were fed and continued deliberating." Defendant called no witnesses to substantiate his claims. The trial court denied relief, reasoning that there was no proof in the record that the jury was prejudiced by requiring deliberations to continue.

## II. Analysis

On appeal, Defendant argues that: (1) the trial court erred in excluding admissible evidence; (2) the trial court erred in communicating with the jury outside the presence of counsel and denying it's request to adjourn for the day; (3) the evidence was not sufficient

---

[3] The trial judge in this case, the Honorable Kyle A. Hixson, was appointed by Governor Bill Lee and confirmed by the Tennessee General Assembly to become a member of this court, the Tennessee Court of Criminal Appeals, and began his term of September 1, 2022. Neither party has raised an objection to his presiding over the hearing on Defendant's motion for new trial, but we note Judge Hixson was sitting by designation at the January 27, 2023 hearing.

to establish first degree premeditated murder; (4) the trial court erred in refusing to instruct the jury on voluntary manslaughter; (5) the State presented insufficient evidence of statutory aggravating factors; (6) the sentence was excessive; and (7) it violates due process for the jury to select a sentence without being given any guidance on how to consider the aggravating and mitigating factors or of the appropriate considerations of imposing a sentence. The State argues that the trial court did not err, or alternatively, any error was harmless. It also argues that the evidence was sufficient and Defendant's sentence was proper.

## A. Admissibility of Hearsay Evidence

Defendant argues that the trial court should have admitted into evidence the statements he made at the Frankfort Regional Medical Center Emergency Department. Nurses recorded Defendant's statements as part of the patient care notes from his hospital visit. At trial, Defendant argued that the statements were relevant to his lack of calmness after the killing and to his state of mind. Defendant does not dispute the statements are hearsay, but contends the trial court should have admitted them under either of three hearsay exceptions: (a) statement for medical treatment; (b) excited utterance; or (c) then-existing state of mind. Defendant also argues the trial court violated his "constitutional right to present a defense" as a result. The State argues that the trial court properly excluded Defendant's statements at the hospital, or alternatively, that any error in excluding the statements was harmless. The State also argues that the trial court did not violate Defendant's constitutional rights. We agree with the State.

Defendant made the statements at issue to various nurses while he was receiving treatment for injuries he incurred after he wrecked his truck. The trial court excluded the following notation as recorded at 10:30 p.m. by nurse Jennifer Bentley at the Frankfort Regional Medical Center Emergency Department:

> This nurse at bedside of pt preparing for xray. Pt. stated to this writer "I [f***ed] up bad ma'am." Continued to state to this nurse that "If you have someone you love, you have to love them even with their flaws[.] I just can't believe I let it get all the way to this. I [f***ng] killed my wife ma'am." Pt. then began sobbing uncontrollably.

The trial court also excluded another statement made by Defendant, which was recorded at 10:45 p.m. by Bailee Pope, another nurse:

> RN @ BS washing pt face and preparing laceration to be stitched by MD. Pt looked @ RN and said, "I messed up tonight. I really messed up. I've f***ed up my life, and my kids['] life. I hurt my baby girl. She didn't deserve that.

No matter what she did, she didn't deserve that." Pt began to cry and could not be consoled. When RN asked pt to clarify what he was talking about, pt kept saying "I hurt my baby girl. I hurt her bad." RN asked if pt meant wife when he said baby girl. Pt said yes and stated "She cheated on m[e] and I lost my sh*t." RN asked pt if he hit his wife, he shook his head no. When asked how he hurt [his] wife pt stated "I killed her. I killed my baby girl." Pt began to cry again. RN ask pt if he shot wife, pt nodded yes and pt began to talk about how wife cheated on him and broke his heart, but still didn't deserve to die, but he lost his mind with anger. He said "I took my kids to my mom[']s house and knew I could never come back. After I shot my wife, I knew my life was over. And it is my son[']s birthday, I can't believe I did this on his birthday."

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801. Generally, "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Relevant here, an otherwise inadmissible hearsay statement may be admissible if it qualifies as a statement for purposes of medical diagnosis and treatment, an excited utterance, or a statement of the declarant's then existing mental, emotional, or physical condition. Tenn. R. Evid. 803(2)-(4). We review a trial court's determination on whether a statement meets a hearsay exception de novo. *State v. Howard*, 504 S.W.3d 260, 275 (Tenn. 2016). Still, we are bound by a trial court's factual findings and credibility determinations unless the record preponderates against them. *Id.* Our supreme court has stated:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, those factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d [739, 759-61 (Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

### 1. Statement for Purposes of Medical Diagnosis and Treatment

The Tennessee Rules of Evidence provide that "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment" are admissible evidence as an exception to the general hearsay rule. Tenn. R. Evid. 803(4). "The declaration must be for both diagnosis and treatment." Tenn. R. Evid. 803(4) Advisory Comm'n Cmts. Statements related to emotional and psychological injury "may be reasonably pertinent to proper diagnosis and treatment of emotional and psychological injury." *State v. Livingston*, 907 S.W.2d 392, 397 (Tenn. 1995).

Defendant argues that by the time he got to the Frankfort Medical Center Emergency Room, he had just left Tennessee in a panic after shooting Ms. Nunez, he had likely been consuming alcohol, and he had just been in a car wreck following a police chase. Thus, Defendant argues "the hospital was surely required to evaluate his mental condition" and "ensure that both his mental condition and his physical condition were stabilized prior to being released." Defendant argues the nurses would not have written down his statements unless it went to his treatment and that the nurses provided the "intervention" of "reassurance" while he was making these statements. Defendant concludes that the trial court should have admitted these statements as statements for purposes of medical treatment and diagnosis.

Defendant's argument is unavailing. Besides that the notes were written by medical personnel, there is no evidence in the record that the recording of these notes was for the purposes of medical treatment or diagnosis. Under the "Discharge Data" on the notes Defendant refers to, the "Clinical Impression" listed that Defendant was treated for "MVC (motor vehicle collision)," "Alcohol use," "Laceration of forehead," and "Burn of abdomen wall." Defendant's statements in these notes do not describe any pains, sensations, or symptoms related to the clinical impressions from Defendant's treatment. Moreover, even if we were to agree that these notes relate to the treatment of Defendant's mental condition as "intervention" of "reassurance," the record lacks any evidence of a connection between the notes and the diagnosis of any medical condition. *See* Tenn. R. Evid. 803(4) Advisory Comm'n Cmts. The trial court did not err in refusing to admit these notes as statements for purposes of medical diagnosis and treatment.

### 2. Excited Utterance

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

Tenn. R. Evid. 803(2). The "ultimate test" of whether a statement is admissible as an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)). There are three distinct requirements to admit hearsay evidence under the excited utterance exception: a startling event or condition that "suspend[s] the normal, reflective thought processes of the declarant"; the statement must "relate to" the startling event or condition; and the statement must be made while the declarant is "under the stress or excitement from the event or condition." *Id.*; *see also State v. Sullivan*, No. E2022-00962-CCA-R3-CD, 2024 WL 268794, at *5 (Tenn. Crim. App. Jan. 24, 2024).

We turn to the first requirement—there must have been a startling event or condition that suspends the declarant's normal thought process. *Kendrick*, 454 S.W.3d at 478; *Franklin*, 308 S.W.3d at 823. "Furthermore, 'a subsequent startling event or condition which is related to the prior event' can also produce an excited utterance." *Kendrick*, 454 S.W.3d at 478 (quoting *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)). We conclude that Defendant experienced a startling event—shooting his wife.

The second requirement is that the statement "must relate to the startling event" such that it "may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." *Franklin*, 308 S.W.3d at 823. Again, there is no dispute that Defendant's statements relate to the startling event. Indeed, Defendant's statements directly address killing his wife, why he did so, and relate to the impact it had on Defendant. Further, Defendant's statements appear to express regret for his actions.

The third requirement is that the declarant made the statement while under the stress or excitement of the startling event. *Id.* When determining whether this requirement is met, a court "may" consider the following:

- the interval or time elapsed between the startling event and the statement;
- the nature and seriousness of the startling event or condition;
- the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and
- the contents and substance of the statement, which may indicate the presence or absence of stress.

*Sullivan*, 2024 WL 268794, at *5 (first citing *State v. Banks*, 271 S.W.3d 90, 117 (Tenn. 2008); and then citing *Franklin*, 308 S.W.3d at 823 n.27). We note that this test requires

- 11 -

consideration of "potentially relevant" factors but is not an exhaustive list itself. *See Franklin*, 308 S.W.3d at 823 n.27.

There is no definite time period for when an excited utterance can occur after a startling event. We have upheld the admission of an excited utterance from an eleven-year-old rape victim when "the rape occurred in the early morning and the disclosure occurred later that evening on the same day." *State v. Sullivan*, No. E2022-00962-CCA-R3-CD, 2024 WL 268794, at *7 (Tenn. Crim. App. Jan. 24, 2024). Conversely, we have also reasoned that a time period of half an hour after a fatal shooting can preclude a statement from being admitted as an excited utterance. *State v. James*, No. W2022-00023-CCA-R3-CD, 2023 WL 3749813, at *9 (Tenn. Crim. App. June 1, 2023).

The issue of "whether the victim made a statement while still under the stress or excitement of the startling event or condition is a question of fact." *Sullivan*, 2024 WL 268794, at *6 (citing *Gilley*, 297 S.W.3d at 760). Before trial, the State moved in limine to exclude Defendant's statements at the hospital. The trial court held a hearing on the matter and granted the motion as to Defendant's statements. It found the statements did not relate to the startling event because they were "made hours after the event in question," after Defendant had left the state and "was brought into custody following a car crash." Accordingly, we are bound by this factual finding unless the evidence in the record preponderates against it.

At oral argument, Defendant referenced *Sullivan* and argued that an excited utterance can be made up to eighteen hours after a startling event. But as noted, whether a trial court admits hearsay evidence under an exception is largely a factual inquiry, and the facts here are distinct from *Sullivan*. In *Sullivan*, the defendant raped an eleven-year-old victim and "threatened physical harm to the victim's mother if the victim revealed what had happened." *Id.* The victim, later that same day, revealed to her friend over video chat what had happened. *Id.* We reasoned that due to "the nature and seriousness of the event, as well as the appearance and condition of the victim, the time interval does not preclude the possibility that the victim was still under the continuing stress of the rape." *Id.* at *7. This case is more like *James*, 2023 WL 3749813. In *James* the defendant shot and killed his mother in front of his aunt after an argument. *Id.* at *1. The defendant called his aunt about thirty minutes after the shooting. *Id.* Defendant made two statements: (1) "Did I hit my mama?" and (2) "I wasn't trying to." *Id.* at *9. We reasoned that neither statement could be admitted as an excited utterance because they were made at least half an hour after the shooting. *Id.* Here, as in *James*, Defendant killed a family member after a prolonged argument, and the statements occurred after a much longer period of time from the startling event than the statements in *James*.

From our review of the record, the evidence does not preponderate against the trial court's ruling to exclude the statements. While the act of killing Ms. Nunez was a startling event, we conclude Defendant did not make the statements while under the stress or excitement of killing her. More than five hours had elapsed between the shooting and when Defendant made the statements to the nurses. In that time, Defendant fled the scene and was able to drop his children off with his mother. While Defendant seemed stressed when he "collapsed" into his mother's arms, he soon was able to purchase brandy at a liquor store "about a block away." The clerk said nothing seemed out of the ordinary with Defendant while he was at the liquor store. While the liquor store video has no sound, nothing in the video shows Defendant was acting stressed. He then drove all the way to Northern Kentucky and stopped at a Walmart to buy a new set of clothes and spoke on his phone while exiting the store. Further, while Defendant was "quite hysterical" at the beginning of the telephone call with Mr. Bacon, he "relaxed up a little bit" by the call's end. It was after that call that he attempted to evade police and crashed his truck. This was a separate startling event, but the nature of Defendant's statements involve killing his wife, not the wreck. Considering the time elapsed between the shooting and the statements and the rational decisions Defendant made in the more than five intervening hours, we conclude that the trial court was correct in finding that the patient care notes were not excited utterances.

### 3. Then Existing Mental, Emotional, or Physical Condition

The Tennessee Rules of Evidence also provide that a statement of the declarant's then existing "state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will" is admissible evidence as an exception to the general hearsay rule. Tenn. R. Evid. 803(3). This rule combines "the hearsay exception with relevancy principles" and "declarations of mental state will be admissible to prove mental state *at issue* or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3) Advisory Comm'n Cmts. (emphasis added). Thus, declarations that do not prove mental state at issue are inadmissible under this exception.

Defendant argues that the statements in the patient care notes express regret for "killing someone who did not deserve it, and had done so in a way that would particularly hurt his surviving son." Further, in his reply brief, Defendant argues the trial court should have admitted them because "his state of mind at the time of the utterance . . . was relevant to his state of mind earlier in the day, and thus relevant to disputed issues such as premeditation."

- 13 -

We are unaware of any authority, and Defendant cites none, that an expression of regret, especially after police arrested him, negates premeditation for first degree murder. Indeed, the Tennessee Rules of Evidence require a declaration "to prove mental state *at issue*." Tenn. R. Evid. 803(3) Advisory Comm'n Cmts. (emphasis added). "'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(e). Regret, on the other hand is defined as "to be very sorry for (regrets his mistakes)" or "an expression of distressing emotion (such as sorrow)." Regret, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/regret (last visited May 6, 2024). We see no connection or correlation between premeditation and regret. Certainly, a defendant can premeditate a murder and then subsequently regret it hours later when confronted with the consequences. Thus, expressions of regret do not negate premeditation. Although we do agree with Defendant that the patient care notes represent his state of mind at the time he made them, the trial court was correct in excluding them because they were not relevant to premeditation, the mental state at issue.

### 4. Constitutional Right to Present Evidence

Defendant argues that the trial court's exclusion of the patient care notes denied him his constitutional right to present evidence. He argues the evidence was important because "it would have shed light on [Defendant's] state of mind with respect to whether he premeditated and whether he was free from excitement and passion." Consequently, Defendant argues, "strict application of the laws of evidence to prevent admission of this evidence constitutes a violation of the constitutional right to present a defense." While Defendant did not cite any authority in support of this argument, we assume he refers to his rights under the Sixth and Fourteenth Amendments to the United States Constitution. *See State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (first citing *Taylor v. Illinois*, 484 U.S. 400 (1988); then citing *Washington v. Texas*, 388 U.S. 14, 23 (1976); then citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); and then citing *State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997)). The State argues that Defendant did not make this argument to the trial court, therefore, this argument is waived. The State further notes Defendant did not request plain error relief in his principal brief. In his reply brief, Defendant argued the plain error factors had been met: "The record is clear, there was no tactical reason not to raise the constitutional issue (given that other arguments for admission were being made), the scope of the constitutional protection is apparent as is the effect on [Defendant's] rights, and substantial justice requires review by this [c]ourt."

"When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review." *Banks*, 271 S.W.3d at 119 (first citing *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); and then citing *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005)); *see also* Tenn. R. App. P. 36. Indeed,

"[n]othing in [Rule 36] shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). And as we have previously noted, "[t]he failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *Gilley*, 297 S.W.3d at 762. Here, Defendant concedes that he did not contemporaneously object; thus, the issue is waived.

Even when a defendant fails to properly preserve an issue for appeal, this court may still consider it under our "discretionary plain error review." *Banks*, 271 S.W.3d at 119; *see also* Tenn. R. App. P. 36. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Still, appellate courts are instructed to "sparingly exercise[]" this discretionary power. *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007) (citations omitted). It is also a defendant's "burden to persuade an appellate court that the trial court committed plain error." *Id.* at 355 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). "[A] defendant's failure to [even] request this relief weighs against any such consideration on our own." *Thompson*, 2023 WL 4552193, at *5 (citing *State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012)). The State raised the possibility of waiver in its responsive brief. However, despite being on notice of a waiver issue, Defendant's entire argument for plain error relief in his reply brief was limited to one sentence and he failed to cite any authority on the issue. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Crim. App. R. 10(b). Moreover, "[w]here a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error." *Thompson*, 2023 WL 4552193, at *5. While Defendant did respond, he did so sparingly and without citing any authority. As such, we decline to exercise our discretionary plain error review.

## 5. Conclusion

After our review, we determine that the trial court did not err in excluding the patient care notes. Defendant is not entitled to relief on this issue.

## B. Jury Communication

Defendant argues the trial court abused its discretion when it instructed the jury to keep deliberating after the jury asked if it could adjourn for the day. Further, Defendant contends the trial court should have made this communication in open court, or at the very least, that it should have made the parties aware. Defendant also argues the trial court erred

in refusing to make factual findings regarding the substance of the communications at the motion for new trial hearing. The State argues that the communication was merely an administrative matter and that it was reasonable for the court to keep the jury deliberating because the hour was not late and the process for ordering dinner was underway.

## 1. Late Night Jury Deliberations

"Late night court in criminal jury cases should be scheduled only when unusual circumstances require it, and not then if either defense counsel or any juror objects upon reasonably based grounds having to do with the lateness of the hour." *State v. McMullin*, 801 S.W.2d 826, 832 (Tenn. Crim. App. 1990). Appellate courts review "whether a trial court errs in conducting late-night proceedings" for an abuse of discretion. *State v. Walls*, 537 S.W.3d 892, 904-05 (Tenn. Crim. App. 2017).

Defendant first argues that "the jury itself apparently believed that it was 'unduly fatigued.'" *See Hembree v. State*, 546 S.W.2d 235, 243 (Tenn. Crim. App. 1976) ("[A] defendant being tried for murder is not only entitled to reasonably alert counsel, but to witnesses who are reasonably alert and that the jury should likewise be clear-headed and not unduly fatigued."). We previously have remanded a case for a new trial when the trial court held the jury until 11:45 p.m. and 11:50 p.m. on back-to-back days of trial. *See McMullin*, 801 S.W.2d at 827. This case is distinct from *McMullin*; here, the jury ate "a good lunch," continued deliberating into the evening while the trial court had "started the process of ordering [the jury] dinner." While the court was arranging dinner for the jury, it merely asked to adjourn for the day. After the jury ate dinner, it "continued deliberating" and returned its verdict at 8:05 p.m. There is nothing in the record that suggests the jury was "unduly fatigued," and there is no objection from any juror in the record. Defendant also argues the trial court's refusal was "coercive in requiring continued deliberations in a way that the jury itself ha[d] indicated it d[id] not believe best." This conclusion is also unsupported by the record. The trial court was making sure the jury got dinner it had ordered for them. This was a reasonable action by the court. Further, Defendant had the opportunity to call witnesses at the hearing on the motion for new trial to establish these allegations and did not do so. We conclude the trial court did not abuse its discretion.

## 2. Ex Parte Communication

Generally, it is "considered improper for the trial judge to communicate with jurors off the record and outside the presence of counsel." *State v. Tune*, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993) (first citing *State v. Smith*, 751 S.W.2d 468, 472 (Tenn. Crim. App. 1988); and then citing *State v. Mays*, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984)). Even so, our supreme court has stated:

We recognize that there may be times when administrative communications between judge and jury may properly transpire in the absence of counsel, so long as these communications do not contain supplemental instructions relating to the case and are clearly incapable of prejudicing the rights of the parties. In this general category would be general communications relating to the jurors' welfare, comforts and physical needs. Such communications must not directly or indirectly refer to the specifics of the case, must be collateral to the issues under consideration, and must not be capable of affecting the deliberative process in any manner.

*Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988) (quoting *Truscott v. Chaplin*, 403 F.2d 644, 645 (3d. Cir. 1968) (per curiam)). Our supreme court has held that "reversal is required where a *timely* complaining party shows specific prejudice or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless." *Id*. (emphasis in original).

Defendant argues the communication between the trial court and jury was error because it took place outside the presence of counsel. Defendant argues that this was not a "purely administrative issue" and "went to whether the jury was going to continue to try to reach a verdict that evening, despite obvious difficulty in doing so, or whether it would begin anew the following morning." Thus, Defendant argues, he was prejudiced because he believes the jury was tired. We disagree. The jury requested to adjourn at some point in the evening. The trial court informed the jury that it was "in the process of ordering dinner. So [it] informed them that [they] were going to continue with that process. [The jury] w[as] fed and continued deliberating." There is no evidence this communication went to whether the jury would reach a verdict that evening and it was "clearly incapable of prejudicing the rights" of Defendant. *Id*. Our review of the record shows this was purely an administrative communication between the trial court and the jury.

3. Trial Court's Factual Findings

Defendant separately argues that the trial court erred "in refusing to make factual findings, or otherwise place on the record, the substance of the communications between the court and they jury" at the hearing on the motion for new trial.[4] Defendant argues, "to the extent that the sequence of events and the content of the communications is unclear, that is because the trial judge refused to make them clear." This argument is not entirely accurate. Although the trial court was initially reluctant to put on evidence, out of concern

---

[4] Defendant also filed supplemental authority on this issue after oral argument pursuant to Rule 27(d) of the Tennessee Rules of Appellate Procedure, citing *Tune*, 872 S.W.2d at 928. The State cited *Tune* in its responsive brief.

for evidentiary rules barring as much, *see* Tenn. R. Evid. 605, it did clearly indicate what happened on the record. It was then within Defendant's power to call witnesses to further develop the record, but he failed to do so.

In sum, we conclude the trial court's communication with the jury was administrative in nature, and Defendant failed to put on proof to the contrary. As such, the trial court did not abuse its discretion and Defendant is not entitled to relief on this issue.

## C. Sufficiency of the Evidence

Defendant argues the evidence was not sufficient to establish premeditated first degree murder. Specifically, Defendant contends the State did not establish that Defendant "was sufficiently free from excitement and passion so as to be able to premeditate" the murder. The State argues the evidence was sufficient to establish premeditated first degree murder when viewed in the light most favorable to the State. We agree with the State.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(e). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Under Tennessee Code Annotated section 39-13-202(a)(1), first degree murder is the "premeditated and intentional killing of another." Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* § 39-13-202(e).

Whether premeditation exists is a question of fact for the jury "which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021). The Tennessee Supreme Court has identified a non-exhaustive list of specific circumstances that suggest the existence of premeditation:

(1) The use of a deadly weapon on an unarmed victim;
(2) The particular cruelty of the killing;
(3) Threats or declarations of the intent to kill;
(4) The procurement of a weapon;
(5) Any preparations to conceal the crime undertaken before the crime was committed;
(6) The destruction or secretion of evidence of the killing;
(7) Calmness after the killing;
(8) Evidence of motive;
(9) The use of multiple weapons in succession;
(10) The infliction of multiple wounds or repeated blows;
(11) Evidence that the victim was retreating or attempting to escape when killed;
(12) The lack of provocation on the part of the victim; and
(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (first citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); then citing *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013); then citing *State v. Kiser*, 284 S.W.3d 227, 268-69 (Tenn. 2009); then citing *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); and then citing *Bland*, 958 S.W.2d at 660).

Here, when viewed in the light most favorable to the State, the evidence showed that Defendant and Ms. Nunez were in a heated argument that continued from the roller rink, through their drive home in separate cars, and ultimately ended in their apartment parking lot. It was Defendant who got out of his company truck and continued the argument at Ms. Nunez's window. The argument was about Ms. Nunez's alleged infidelity—this was Defendant's motive. The evidence showed Ms. Nunez tried to disengage multiple times. She could not leave because A.G. had her keys, but Ms. Nunez told A.G. to call the police. She rolled her window up, but Defendant punched it with

enough force to break it. Defendant then deliberatively walked back to his truck, not to leave but to retrieve his gun. Defendant conveyed to A.G. that he was about to do something illegal when Defendant repeated Ms. Nunez's request to "Call the cops." There was no evidence that Defendant retrieved the gun for his own safety, as Ms. Nunez's pistol remained in her purse.

Defendant then shot Ms. Nunez six times. Moreover, Defendant fired two shots quickly, paused for a few seconds, then continued firing. The pause in his firing and the unspent round found at the scene supports the inference that the gun jammed or misfired before he cleared it and continued shooting. While still strapped in her seatbelt, Ms. Nunez sustained multiple wounds. One bullet hit her neck and into her jaw. Another struck her jaw and into her brain. A third bullet struck her left side and entered her lungs. The fourth bullet lodged in her chest, while the fifth and sixth bullets struck her separate arms. Medical evidence showed that Ms. Nunez was turning away as Defendant shot her. It also showed she did not immediately die, yet Defendant did not attempt to render any aid to her. Instead, Defendant fled, dropped his children off with his mother, bought liquor, drove hours into Northern Kentucky, and bought a change of clothes at a Walmart. During his purchases at the liquor store and Walmart, and the end of his conversation with Mr. Bacon, Defendant appeared calm.

In his brief, Defendant cites nine cases where this court affirmed first degree murder convictions with, debatably, stronger evidence of premeditation. Defendant points to these cases as evidence that there was no premeditation in the case at hand. We disagree with Defendant's logic. While there may be cases with more evidence of premeditation, that does not preclude a reasonable jury from finding premeditation here. We conclude the evidence of premeditation here was strong: Ms. Nunez tried to retreat and end the argument by rolling up her window. After breaking the window, Defendant declared his intent by telling A.G. to "Call the cops." He went back to his truck and procured his pistol. Defendant used a deadly weapon on the unarmed Ms. Nunez. The killing was cruel in several ways—Defendant repeatedly shot Ms. Nunez in front of all of her children, severely traumatizing them, and Ms. Nunez sustained gunshot wounds over her entire upper body as she turned away. Defendant did not attempt to aid his dying wife, but fled and was calm enough to buy liquor, drive to Northern Kentucky, and buy new clothes at Walmart. *See Reynolds*, 635 S.W.3d at 916-17. Thus, the evidence is sufficient to sustain Defendant's conviction for first degree murder.

D. Voluntary Manslaughter Instruction

Defendant argues the trial court erred when it failed to instruct the jury on the lesser-included offense of voluntary manslaughter. The State argues the proof did not raise voluntary manslaughter. We agree with the State.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. Generally, when a party in writing requests a lesser included-offense instruction, the trial judge shall instruct the jury as such. Tenn. Code Ann. § 40-18-110(a). "However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense." *Id.* While the trial court "shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence," it "shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense." *Id.*

Whether the trial court should have given a particular lesser-included offense instruction is a mixed question of law and fact subject to de novo review. *Banks*, 271 S.W.3d at 124 (first citing *State v. Hatfield*, 130 S.W.3d 40, 41 (Tenn. 2004); and then citing *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004)). A "reviewing court considers the following three questions: (1) whether the offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether the failure to give the instruction is harmless error." *Id.* (citing *State v. Allen*, 69 S.W.3d 181, 187 (Tenn. 2002)). The first question is satisfied because there is no dispute that voluntary manslaughter is a lesser-included offense of first degree murder. *See State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998).

As to the second question, "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. Defendant argues "the circumstances of this case raised the possibility that [Defendant] had been acting pursuant to a state of passion produced by adequate provocation." The evidence simply does not support that conclusion. While the argument with his wife may have subjectively impassioned Defendant, an argument alone is not an "adequate provocation sufficient to lead a reasonable person" to kill another. *See Seals v. State*, 62 Tenn. 459, 465 (Tenn. 1874) ("It is true, as a general rule, that no provocation by words alone will reduce the crime of murder to that of manslaughter."). Defendant cites *State v. Thorton*, 730 S.W.2d 309, 312 (Tenn. 1987) to argue that marital infidelity "is an act obviously calculated to arouse ungovernable passion." This argument lacks context when we examine the facts of *Thorton*. There, the defendant "found his wife and the victim . . . engaged in sexual relations in the front bedroom" of the defendant's home. *Id.* at 309. He fired a single shot at the victim who died sixteen days later as a result of a massive infection from the bullet wound. *Id.* Here, Defendant did not catch Ms. Nunez in any physical act with another. Moreover, the only evidence of marital infidelity here was A.G.'s statement

that the couple's argument concerned Ms. Nunez's cheating. This case is factually distinguishable from *Thorton*.

In sum, we agree with the trial court that the evidence does not support a voluntary-manslaughter instruction, and Defendant is not entitled to relief on this issue.

## E. Sentencing

Defendant makes three separate arguments regarding sentencing. First, Defendant argues that the State did not provide sufficient evidence for the statutory aggravating factors that the jury found. Second, Defendant argues that his sentence was, therefore, excessive. Third, Defendant advances a constitutional challenge to Tennessee Code Annotated section 39-13-207 regarding jury guidance and due process. The State asserts that the jury properly found the statutory aggravating factors, the sentence was not excessive, Defendant waived his constitutional argument, and alternatively, the statute is constitutional. We address each argument in turn.

### 1. Statutory Aggravating Circumstances

In a first degree murder case, the jury may "fix the punishment" of a defendant to a sentence of life without the possibility of parole "upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances." Tenn. Code. Ann. § 39-13-204(a), (i). Relevant here, the jury may impose life without the possibility of parole if "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[,]" or "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *Id.* § 39-13-204(i)(2), (5). When determining whether the evidence supports the finding of a statutory aggravating factor, "the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *State v. Carpenter*, 69 S.W.3d 568, 574 (Tenn. Crim. App. 2001) (citing *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000)).

### i. Prior Conviction Involving the Use of Violence

The statute requires the prior offense to be one "whose statutory elements involve the use of violence to the person." Tenn. Code. Ann. § 39-13-204(i)(2). The State introduced a certified judgment and guilty plea colloquy from Defendant's 2011 conviction for facilitation of aggravated robbery. The elements for facilitation of aggravated robbery are: (1) knowledge that another person intends to commit aggravated robbery, (2)

furnishment of substantial assistance in the commission of aggravated robbery, and (3) that the substantial assistance in the commission of aggravated robbery was furnished knowingly. *Id.* § 39-11-403; 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 3.02. By its very nature, facilitation of aggravated robbery requires that an aggravated robbery was committed. *See, e.g.*, *State v. Hughes*, No. M2015-01688-CCA-R3-CD, No. M2015-01207-CCA-R3-CD, 2016 WL 6956804, at *4 (Tenn. Crim. App. Nov. 29, 2016) ("Because aggravated robbery includes, at a minimum, an element of threatened bodily injury, facilitation of aggravated robbery necessarily includes such an element."). Thus, facilitation of aggravated robbery necessarily includes the elements of aggravated robbery: (1) the intentional or knowing theft of property by violence or putting another in fear, (2) that is accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon, or (3) where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -402.

Defendant first argues that facilitation of aggravated robbery does not have an element "relating to use of violence to the person." As discussed above, this argument fails to recognize that facilitation of an offense includes the elements of that offense. *See State v. Burns*, 6 S.W.3d 453, 470 (Tenn. 1999); *see also Hughes*, 2016 WL 6956804, at *4. Alternatively, Defendant argues that Defendant did not commit aggravated robbery through "the use of violence to the person" but by "placing the victim in fear."

Defendant was indicted for "unlawfully, intentionally, knowingly[,] and violently" taking a wallet and its contents through the use of a deadly weapon in violation of Tennessee Code Annotated section 39-13-402 on or about September 23, 2010. In Defendant's guilty plea colloquy, when the State offered that the victim stated Defendant and another male both displayed handguns, grabbed him, and demanded money from him, Defendant agreed these facts were true. Further, when Defendant was asked whether he was pleading guilty because he was guilty, Defendant replied, "Yes sir."[5]

Defendant's argument that "it appears that the aggravated robbery was accomplished by placing the victim in fear" is not supported by the evidence. From our review of the record, it is clear that Defendant and his accomplice used violence to rob the victim of his wallet and its contents. Defendant agreed with the factual basis supporting this, and is, therefore, not entitled to relief on this issue.

---

[5] Moreover, at the guilty plea colloquy, the State indicated it reduced Defendant's crime to facilitation to commit aggravated robbery because his co-defendant was a juvenile: the co-defendant's "case was dealt with in juvenile court and he received the same sort of sentence, and so the [S]tate felt that the two of them being equally culpable should be treated in the same fashion."

### ii. Especially Heinous, Atrocious, or Cruel

The "especially heinous, atrocious, or cruel" aggravating circumstance "may be proved under either of two prongs: torture or serious physical abuse." *Keen v. State*, 31 S.W.3d 196, 206 (Tenn. 2000) (quoting *State v. Hall*, 8 S.W.3d 593, 601 (Tenn. 1999)). Our supreme court has defined torture as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Id.* (quoting *State v. Morris*, 24 S.W.3d 788, 797 (Tenn. 2000)). Moreover, "[t]he anticipation of physical harm to oneself is torturous." *State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999) (first citing *State v. Nesbit*, 978 S.W.2d 872, 886-87 (Tenn. 1998); and then citing *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn. 1997)). The other prong requires that "the abuse must be physical rather than mental in nature." *Keen*, 31 S.W.3d at 206 (quoting *Hall*, 8 S.W.3d at 601).

Defendant makes several arguments as to why the murder of his wife was not especially heinous, atrocious, or cruel. First, Defendant argues there was inadequate proof that Ms. Nunez was looking at A.G. when she was shot. Alternatively, Defendant argues even if Ms. Nunez was looking at A.G., that does not qualify as torture. Defendant also argues that six shots do not constitute serious physical abuse beyond abuse necessary to produce death.

The evidence supports the jury's finding of an especially heinous, atrocious, or cruel murder. Defendant and Ms. Nunez had been arguing from the time they were at Skatetown until they got to the parking lot at their apartment. Leading up to the murder, Ms. Nunez attempted to disengage from Defendant by rolling up her driver-side window. Defendant responded by smashing Ms. Nunez's window, grabbing her phone, and throwing it across the pavement. This prompted Ms. Nunez to tell A.G. to call the police. Defendant then walked to his truck, retrieved a gun, and returned to Ms. Nunez. In the light most favorable to the State, Ms. Nunez was likely anticipating harm from the moment Defendant smashed her window until he eventually pulled the trigger. Moreover, after two bullets, Defendant paused to clear his gun and resumed firing. During this time Ms. Nunez was likely anticipating even more physical harm. As the State points out, this anticipation was probably further heightened since she was trapped in her car, having given her keys to A.G. *See State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999) ("The anticipation of physical harm to oneself is torturous."). The evidence also shows that Ms. Nunez turned away from Defendant and towards her passenger-side door where A.G. was standing only feet away. It follows that Ms. Nunez not only was anticipating harm to herself, but likely also anticipating harm to A.G. *See id.* (citing *State v. Soto-Fong*, 928 P.2d 610, 628-29 (Ariz. 1996)) ("This mental torment is intensified when a victim either watches or hears a spouse, parent, or child being harmed or killed, or anticipates the harm or killing of that close relative and is helpless to assist."). Finally, Doctor Maxwell Rollins testified that Ms. Nunez was "most likely . . . not rendered unconscious" immediately by these six bullets.

*See id.* (citing *Hawkins v. State*, 891 P.2d 586, 597 (Okla. 1994) (mental suffering includes uncertainty over one's ultimate fate)).

As to Defendant's second argument, the State introduced medical testimony that Ms. Nunez was shot six times. Five bullet wounds had no stippling, which suggests that they were shot from over thirty-six inches away. The other bullet traveled through Ms. Nunez's brain and had stippling, suggesting it was shot from a closer distance than the others. In the light most favorable to the State, this shows that Defendant fired an execution shot. A rational jury could have concluded that this murder involved "serious physical abuse beyond that necessary to produce death." Tenn. Code. Ann. § 39-13-204(i)(5).

The evidence supports both the jury's findings that Defendant was previously convicted of one felony involving the use of violence to the person and that the murder was especially heinous, atrocious, or cruel, *see id.* § 39-13-204(i)(2), (5). We conclude that Defendant is not entitled to relief on this issue.

2. Excessive Sentence

Defendant argues the jury abused its discretion and arbitrarily imposed Defendant's sentence. Under Tennessee law:

> [A] sentence of imprisonment for life without possibility of parole shall be considered appropriate if the [S]tate proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion.

Tenn. Code Ann. § 39-13-207(g).

Essentially, Defendant argues the mitigating factors in this case—that the murder occurred at the conclusion of a heated argument and Defendant's remorse—make a sentence of life without the possibility of parole excessive and an abuse of discretion. There is no evidence the jury abused its discretion or imposed the sentence arbitrarily. Here, the State proved beyond a reasonable doubt the presence of two statutory aggravating factors.[6] The jury is not required to find mitigating factors, but even with the mitigating factors Defendant identifies, the jury's sentence is not arbitrary given its finding of at least one statutory aggravating factor beyond a reasonable doubt. Accordingly, Defendant's sentence is supported by the evidence, and he is not entitled to relief on this issue.

---

[6] *See* discussion *supra* Section II.E.1.

### 3. Jury Guidance and Due Process

Lastly, Defendant argues Tennessee Code Annotated section 39-13-207(c) is unconstitutional. Because the statute tells the jury to "weigh and consider" aggravating and mitigating circumstances but gives no guidance on how to do so, Defendant argues the statute allows "the jury to impose the greater punishment for a good reason, for a nonsensical reason, for a constitutionally impermissible reason, or for no reason at all." Defendant argues the statute should require the jury to find that the aggravating circumstances outweigh the mitigating circumstances before imposing the greater punishment. The State argues first that Defendant raises this issue for the first time on appeal; therefore, it is waived. Alternatively, the State argues Defendant is not entitled to plain error relief.

An issue raised for the first time on appeal is waived. *See Banks*, 271 S.W.3d at 119 (first citing *Faulkner*, 154 S.W.3d at 58 (Tenn. 2005); and then citing *Maddin*, 192 S.W.3d at 561); *see also* Tenn. R. App. P. 36. Still, this court may consider it under our "discretionary plain error review." *Banks*, 271 S.W.3d at 119; *see also* Tenn. R. App. P. 36. When a defendant fails to even request plain-error relief, it "weighs against any such consideration on our own." *Thompson*, 2023 WL 4552193, at *5 (citing *Cornwell*, 2012 WL 5304149, at *18). Here, although the State raised the possibility of waiver in its response brief, Defendant did not respond to this argument in a reply brief or otherwise. *See Thompson*, 2023 WL 4552193, at *5 ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error."). In any event, Defendant cannot establish even the first plain error requirement—a breach of a clear and unequivocal rule of law. *See State v. Enix*, 653 S.W.3d 692, 701 (Tenn. 2022); *see also State v. Smith*, No. W2011-01630-CCA-R3-CD, 2013 WL 3702369, at *17 (Tenn. Crim. App. July 12, 2013) ("Given that the flight instruction has never been deemed unconstitutional, we cannot conclude that there was a breach of a clear and unequivocal rule of law or, thus, any plain error"). Here, as in *Smith*, no court has held that Tennessee Code Annotated section 39-13-207(c) is unconstitutional; thus, there has not been a breach of a clear and unequivocal rule of law. Defendant is not entitled to relief on this issue.

## III. Conclusion

After our thorough review of the record, briefs, oral argument, and applicable law, we affirm the judgments of the trial court.

 

_____

MATTHEW J. WILSON, JUDGE